Walter O. HOWARTH, Trustee in Bankruptcy of Spohn Motor Co., also known as Spohn Motor Company, Inc., Plaintiff,

v.

UNIVERSAL C.I.T. CREDIT CORPORATION, Defendant.

Civ. A. No. 17876.

United States District Court
W. D. Pennsylvania.

March 5, 1962.

Harry R. Levy, Pittsburgh, Pa., for plaintiff.

Robert A. Doyle, Duff & Doyle, Pittsburgh, Pa., for defendant.

MARSH, District Judge.

The plaintiff, trustee in bankruptcy of Spohn Motor Company, Inc. (Spohn), brought this action, pursuant to § 60 of the Bankruptcy Act, as amended March 18, 1950, 11 U.S.C.A. § 96 (1961 Supp.), to recover from the defendant, Universal C.I.T. Credit Corporation (UCIT) the value of property transferred to UCIT from Spohn within four months of filing the petition in bankruptcy.

The underlying facts stipulated by the parties are adopted by the court. From these facts it appears that an involuntary petition in bankruptcy was filed against Spohn on January 6, 1958, and it was adjudicated a bankrupt on February 13, 1958.

On February 5, 1957, pursuant to a Loan Agreement (Ex. H), UCIT advanced to Spohn the sum of $75,000. On the same day, Spohn executed a Chattel Mortgage (Ex. I) covering certain chattels. Shortly thereafter UCIT perfected a security interest therein by properly filing a Financing Statement (Ex. J) under the provisions of the Uniform Commercial Code—Secured Transactions, Act of April 6, 1953, P.L. 3, § 9–101 et seq.; 12A Purdon's Pa.Stat.Ann. § 9–101 et seq. (hereinafter referred to as U.C.C.).

Prior to September 28, 1957, Spohn also executed in favor of UCIT used car Trust Receipts (Ex. D) and assigned to UCIT certain Bailment Leases (Ex. E).[1]

During August of 1957, and for some months prior thereto, UCIT had advanced to Spohn, or to Ford Motor Company for the benefit of Spohn pursuant to an Agreement for Wholesale Financing (Ex. A), dated December 13, 1954, the principal sum of $437,972.84 for 201 new motor vehicles, each secured under the terms of new car Trust Receipts (Ex. G). On March 3, 1955, UCIT perfected a security interest in, inter alia, new and used motor vehicles, equipment, accessories or replacement parts, and proceeds by properly filing a Financing Statement (Ex. B).

Prior to September 28, 1957, 110 of the new motor vehicles had been sold out of trust by Spohn, leaving 91 new ve-

---

1. Spohn also executed a Special Nonrecourse Agreement (Ex. K), which has no apparent relevance to the issues contested in this litigation.

hicles which UCIT repossessed and sold for $188,268.32, leaving a remainder of $249,704.52 due by Spohn to UCIT for new vehicles sold out of trust.

Between September 28, 1957 and October 31, 1957,[2] Spohn being thus indebted to UCIT, transferred to it the following items, to which the plaintiff-trustee concedes he has no claim: the proceeds of the sale of 15 vehicles subject to bailment leases;[3] office furniture, fixtures and equipment;[4] shop equipment;[5] accounts receivable from UCIT;[6] accounts receivable from Ford Motor Company for wholesale incentive;[7] warranty and policy claims receivable from Ford Motor Company;[8] and other receivables from Ford Motor Company.[9] The facts show conclusively that UCIT had a perfected security interest in each of these items.

In addition to these items, during the same period, Spohn transferred to UCIT, either voluntarily or involuntarily the following: bank cash, shares of stock, customers receivables, 70 used vehicles, and motor parts and accessories. These transfers were made by Spohn for its antecedent debts, at a time when Spohn was insolvent and UCIT had reason to so believe. The plaintiff-trustee contends that these transfers constituted preferences within the meaning of § 60 of the Bankruptcy Act, since their effect was to enable UCIT to obtain a greater percentage of its debt than Spohn's unsecured creditors, except as to those items in which UCIT held a perfected security interest.

We take up the disputed items seriatim.

## BANK CASH [10]

■ Spohn's bank account in the Peoples First National Bank & Trust Company in the sum of $6,734.21 was garnisheed and transferred to UCIT pursuant to a writ of attachment execution issued on a judgment in favor of UCIT in the sum of $75,000. The lien against the bank cash obtained by the attachment within four months of bankruptcy and while Spohn was insolvent is null and void. Section 67 of the Bankruptcy Act, 11 U.S.C.A. § 107.

Spohn's bank account was not under the control of UCIT, and the source of this money has not been identified. Apparently UCIT has not been able to trace any of the money in the bank to proceeds from the sales of collateral on which it held a security interest. The defendant argues that the money must have come from the sale of property in which it had a security interest. This is an unwarranted assumption for all of it could have come from services rendered, sale of Spohn's common stock, or loans to Spohn.

The court may not assume the source of the money in the bank. The burden is upon UCIT to trace cash proceeds received by Spohn from the disposition of secured collateral into the bank deposits. This it has not done. This cash was received by Spohn, the debtor, and deposited more than 10 days prior to the bankruptcy proceeding (cf. U.C.C. § 9–306(2)); it is not identifiable cash proceeds received from the sale or disposition of any collateral. Thus it is free from any security interest of UCIT and is subject to the claims of general creditors represented by the plaintiff-trustee.

2. Undenied averment in Complaint.

3. Brief Ex Parte Plaintiff, p. 6; Reply Brief to Defendant's Brief, p. 30; Stipulated Facts, §§ 7(a), 12(b).

4. Brief Ex Parte Plaintiff, p. 7; Stipulated Facts, §§ 7(c), 18.

5. Brief Ex Parte Plaintiff, p. 7; Stipulated Facts, §§ 7(d), 18.

6. Brief Ex Parte Plaintiff, p. 9; Stipulated Facts, §§ 7(g), 22.

7. Brief Ex Parte Plaintiff, p. 9; Stipulated Facts, §§ 7(h), 23(a).

8. Brief Ex Parte Plaintiff, p. 9; Stipulated Facts, §§ 7(i), 23(b).

9. Brief Ex Parte Plaintiff, p. 9; Stipulated Facts, §§ 7(j), 23(c).

10. Stipulated Facts, §§ 7(1), 25.

We hold the bank cash garnisheed by UCIT is a voidable preference and the plaintiff-trustee is entitled to recover $6,734.21.

## SHARES OF STOCK [11]

■ The sum of $869.42 was realized from the sale of 20 shares of Ford Motor Company common stock transferred to UCIT within four months of Spohn's bankruptcy. There is no tracing to indicate where the money came from to enable Spohn to purchase these shares. The stock is not "identifiable proceeds". We hold that the transfer to defendant is a voidable preference and that the plaintiff-trustee is entitled to recover $869.42.

## ACCOUNTS RECEIVABLE [12]

■ Spohn collected customers receivables by cash and checks in the sum of $10,847.75 and transferred this amount to UCIT within four months of bankruptcy. Of this sum $1,100.00 was identified as cash proceeds from the sale of two new vehicles on which UCIT held a perfected security interest,[13] leaving in dispute the sum of $9,747.75. This remainder comprises commingled cash proceeds arising from the sale of motor vehicles, parts and services.

From the Stipulated Facts and Exhibit L, it cannot be ascertained whether any of the articles sold were covered by a perfected security interest in favor of UCIT. Exhibit L gives only the name of the person owing the account, the amount paid, and the date the money was transferred to UCIT. Moreover, even if it were to be assumed that some of the accounts arose from the sale of parts and vehicles, it still could not be ascertained whether or not any portion of any account arose from

services performed by Spohn. As UCIT did not hold a security interest in proceeds received from the sale of services, it is not entitled to retain proceeds which may have come from this source.

Furthermore, as we understand the Uniform Commercial Code, in insolvency proceedings the secured creditor is only entitled to commingled cash when it is received as proceeds of collateral within ten days of the filing of the petition.[14]

For these reasons, we hold that the plaintiff-trustee is entitled to $9,747.75.

## 11 USED VEHICLES [15]

■ These 11 used vehicles were financed by UCIT as is evidenced by used car Trust Receipts (Ex. D). UCIT obtained a security interest in these used vehicles held by Spohn for resale by virtue of the Agreement for Wholesale Financing (Ex. A), covering new and used merchandise, and the used car Trust Receipts (Ex. D). This security interest was perfected by filing Financing Statements (Exs. B and J) in the offices of the Secretary of the Commonwealth and the Prothonotary of Allegheny County where Spohn did business.

The plaintiff-trustee argues that the only way to obtain a perfected security interest in used motor vehicles is by noting the lien on the title certificate of each car pursuant to the Pennsylvania Motor Vehicle Code.[16] We do not agree.

■ It is true that § 203(b) of the Motor Vehicle Code in effect during the wholesale transactions involved in this litigation "clearly established a method of creating liens on motor vehicles" by showing a lien or encumbrance on the certificate of title. Mellon National Bank &

11. Stipulated Facts, §§ 7(k), 24.

12. Stipulated Facts, §§ 7(e), 7(f), 19; Ex. L.

13. The Appel and Nebel cars. See Stipulated Facts, § 19.

14. The limited right of a secured party to a debtor's cash received within 10 days of bankruptcy is exclusive and a creditor does not have the option to claim a greater sum received prior to

the 10 days even if he is able to identify the greater sum as cash proceeds of the collateral. See comment 2(a) to U.C.C., § 9–306, p. 416. Of course, as pointed out, the defendant UCIT is unable to identify the disputed remainder of $9,747.75 as cash proceeds of the collateral.

15. Stipulated Facts, §§ 7(a), 12(a).

16. Act of May 1, 1929, P.L. 905, as amended, now 75 P.S. § 101 et seq.

Trust Company v. Cabin, 177 Pa.Super. 417, 110 A.2d 888, 889 (1955), citing the Motor Vehicle Code of June 27, 1939, P.L. 1135, § 203(b).[17]

Notwithstanding, it seems certain that a finance company which advances money for wholesale financing of *new cars* can perfect a valid security interest therein by filing a financing statement in the offices of the Secretary of the Commonwealth and the Prothonotary of the County in which the dealer does business. U.C.C. §§ 9–302(1), 9–401(1) (a); Sterling Acceptance Co. v. Grimes, 194 Pa.Super. 503, 168 A.2d 600 (1961); Taylor Motor Rental, Inc. v. Associates Discount Corp., 196 Pa.Super. 182, 173 A.2d 688 (1961); cf. Girard Trust Corn Exchange Bank v. Warren Lepley Ford, Inc. (No. 1), 12 Pa. Dist. & Co.2d 351, 357 (1957). As we see it, this is because the Motor Vehicle Code of 1939 at § 201(b) provides that a dealer, such as Spohn, "need not obtain certificate of title for *new* motor vehicles * * * until and before sale thereof."

Likewise, § 207(c) of the Motor Vehicle Code, which was in effect at the time Spohn's used cars were sold (Act of June 29, 1937, P.L. 2329, § 207(c)), provided that a dealer in used cars "shall not be required to apply for a certificate of title" but shall notify the Department of the acquisition of the vehicle within ten days. Therefore, it is our opinion that a company such as UCIT engaged in wholesale financing may perfect a valid security interest in *used* cars by filing a financing statement pursuant to §§ 9–302 (1) and 9–401(1) (a) of the U.C.C.

In view of the similarity of §§ 203(b) and 207(c) of the Motor Vehicle Code, we cannot perceive any good reason why a lender engaged in wholesale financing cannot perfect a valid security interest in used cars by the same method he employs to perfect a valid security interest in new cars.

Our conclusion finds support in the underlying purposes and policies of the U.C.C., enacted subsequent to these sections of the Motor Vehicle Code, which are:

"(a) to simplify and modernize and develop greater precision and certainty in the rules of law governing commercial transactions;

"(b) to preserve flexibility in commercial transactions and to encourage continued expansion of commercial practices and mechanisms through custom, usage and agreement of the parties". Section 1–102 (2).

In addition we think it simplifies the means whereby a dealer's prospective creditors may protect themselves. A creditor who must search the records in the offices of the Secretary of the Commonwealth and the Prothonotary of the County for notice of encumbrances on new cars in a dealer's inventory at the same time will get notice of encumbrances on the used cars in his inventory. This method seems to be much more convenient and effective than if the creditor in order to protect himself should be forced to demand an inspection of the dealer's title certificate to each used car in his inventory,—a certificate which the dealer is not required to obtain under the Motor Vehicle Code.

Moreover, if the plaintiff-trustee's contention prevails, a lender such as UCIT who engages in wholesale financing of used cars would be compelled to insist that a dealer obtain a new certificate of title for each used car acquired, contrary to the exemption stated in § 207(c) of the Motor Vehicle Code, and show the finance company's encumbrance thereon. This procedure would add a non-using owner, i. e., the dealer, to the chain of title, thereby decreasing the value of the used car. We do not think the Legislature intended to subject those engaged in wholesale financing of used cars to such troublesome, time-consuming and costly procedure to obtain a valid lien, when those engaged in financing new cars can perfect a valid security interest by sim-

17. This section was last amended prior to the transactions here involved by Act of May 18, 1949, P.L. 1412.

ply filing the appropriate financing statements.[18]

In Tanner, Pennsylvania Business Law Under the Uniform Commercial Code (1954), p. 723, it is stated:

"Under the Commercial Code, filing with the Secretary of the Commonwealth is the proper procedure for wholesale transactions in motor vehicles."

A similar statement appears in Pennsylvania Banks and the Uniform Commercial Code (1953–1954), p. 65:[19]

"If a bank is lending money to a motor vehicle manufacturer, jobber or *dealer* on the security of new or *used* vehicles, the filing of a financing statement will be necessary. If the vehicles are new no certificate of title will have been issued on which the bank's security interest could be indicated [V.C. sec. 201(b), 75 P.S. 31 *]. If they are *used* vehicles the borrower will hold the certificate of title of the former owner, assigned to the borrower, *but he will not be required to obtain a new certificate of title until he resells the vehicle* [V.C. sec. 207 (c), 75 P.S. 37 **], *and hence there is no requirement that the bank's security interest be indicated on the certificate*. The filing of a financing statement, therefore, is the only way in which the bank can obtain a perfected security interest in such vehicles." (Emphasis supplied.)

The plaintiff-trustee also argues that to protect buyers of used cars in a dealer's inventory from liens in favor of a finance company, the dealer should be required to obtain a title certificate for each used car in his inventory, despite the exemption in § 207(c) of the Motor Vehicle Code, and show the finance company's lien thereon. However, § 9–307 (1) of the U.C.C. protects such buyers and they take the cars free of perfected security interests, and this is so even if the buyers have actual knowledge of the wholesale security agreement. Cf. Sterling Acceptance Co. v. Grimes, supra, at p. 602.

■ Finally, the plaintiff-trustee contends that because UCIT had advanced only $6,340.00 on these 11 used cars, he is entitled to the excess amount of $1,465.00 received when UCIT sold this collateral for $7,805.00.

The Agreement for Wholesale Financing (Ex. A) provides:

"Until payment in full, we [Spohn] will hold all proceeds separately and in trust for you [UCIT]."

In our opinion, this agreement creates a security interest in all proceeds arising from the sale of any collateral for the entire debt owing to UCIT by Spohn. The security interest in all proceeds was perfected by filing the Financing Statement (Ex. B), which specifies: "The following proceeds are also covered", inter alia, "cash taken in the sale * * * of the property * * *." Since there is a remainder due on the Spohn debt, we hold that UCIT is entitled to retain all the

---

18. The problem could have been eliminated by compliance with the provision contained in the used car Trust Receipts (Ex. D): "If certificates of title are required or permitted by law, we [Spohn] will obtain such certificates with respect to the chattels, showing a lien hereof, and do everything necessary or expedient to preserve or perfect such lien." Spohn did not comply with this provision and UCIT did not enforce it. The identical provision is contained in the new car Trust Receipts (Ex. G), and, of course, was not enforced. In view of §§ 207(c) and 203(b) of the Motor Vehicle Code,

we think, notwithstanding, that UCIT obtained a valid perfected security interest in the *used* cars, as well as in the *new* cars, by filing the Financing Statements (Exs. B and J) under §§ 9–302(1) and 9–401(1) (a) of the U.C.C.

19. Prepared by a Committee of counsel for The Philadelphia Clearing House Association, the Pittsburgh Clearing House Association, Pennsylvania Bankers Association, and certain of their member banks.

* Now 75 P.S. § 201(b).

** Now 75 P.S. § 207.

money it received from the sale of the 11 used cars.[20]

## 17 USED VEHICLES [21]

■ These 17 used vehicles were taken in trade by Spohn toward the purchase price of 17 new vehicles. On each of the new vehicles sold, UCIT held a perfected security interest by virtue of the Agreement for Wholesale Financing (Ex. A), new car Trust Receipts (Ex. G), and Financing Statement (Ex. B). The 17 new vehicles were sold out of trust by Spohn.

As heretofore pointed out, pursuant to the Agreement for Wholesale Financing, the Trust Receipts, and the Financing Statement, UCIT had a perfected security interest in the proceeds arising from the sale of collateral. The Financing Statement provided:

"The following proceeds are also covered: * * * (b) merchandise taken in trade".[22]

The other mentioned documents provided in substance that UCIT was to have a security interest in "trade-ins". Thus, these used vehicles taken in trade were identifiable proceeds covered by the Financing Statement (Ex. B). U.C.C. § 9–306(1) (a).

The plaintiff-trustee contends that according to the Motor Vehicle Code no lien can be obtained on a "trade-in" unless the lien is noted on the title certificate. It is the opinion of the court that a finance company such as UCIT engaging in wholesale financing of new and used vehicles held for resale by a dealer, and having obtained a security interest in new vehicles and the proceeds thereof, may perfect its security interest in the proceeds by filing in compliance with § 9–302(1) of the U.C.C., and, in view of § 207(c) of the Motor Vehicle Code, need not require the dealer to procure title certificates for each "trade-in" on which to show its lien.

Accordingly, we think that UCIT held a perfected security interest in these used vehicles taken in trade when it properly filed its Financing Statement covering proceeds and "merchandise taken in trade". The filed Statement fulfilled the statutory purpose of giving notice to Spohn's potential creditors of UCIT's security interest in the "trade-ins".

The security interest of UCIT in these proceeds was created at the times the Agreement and the Trust Receipts were executed and perfected by the filing of the Financing Statement in March, 1955. Pursuant to § 9–306(1) of the U.C.C., this security interest continued up to the time UCIT took possession, within four months of bankruptcy, of the 17 "trade-ins", i. e., identifiable proceeds. In our opinion § 9–306(1) is not in conflict with § 60 of the Bankruptcy Act, and the perfected security interest of UCIT in these proceeds is enforceable.[23]

We hold that UCIT is entitled to retain the money received from the sale of the 17 used vehicles.

## 42 USED VEHICLES [24]

■ These 42 used vehicles were taken in trade for new vehicles, which had been financed by UCIT, under the terms of the Agreement for Wholesale Financing (Ex. A) and the Trust Receipts (Ex. G).[25] These vehicles must also be regarded as identifiable proceeds in which, as previously shown, UCIT had perfected a security interest by filing the Financing Statement (Ex. B).

It was not stipulated that the new vehicles were sold out of trust by Spohn.

20. It is provided in Financing Statement (Ex. J) that it is supplemental to Financing Statement (Ex. B).

21. Stipulated Facts, §§ 7(a) 12(c).

22. We note that supplemental Financing Statement (Ex. J) filed in February, 1957, covers motor vehicles "taken in trade".

23. See U.C.C. Comment 2(b), 12A Purdon's Pa.Stat.Ann. § 9–306, p. 417. Cf. Hamilton Nat. Bank v. McCallum, 58 F. 2d 912 (6th Cir. 1932).

24. Stipulated Facts, §§ 7(a), 12(d), 13.

25. Stipulated Facts, § 13.

However, as we interpret the pertinent security agreements, UCIT created a security interest in *all proceeds*, which would include these 42 "trade-ins", until *all the indebtedness* due by Spohn to UCIT was paid. As heretofore quoted, the Agreement for Wholesale Financing (Ex. A) provided that until payment in full, Spohn would hold all proceeds separately and in trust for UCIT. Likewise, the Trust Receipts (Ex. G), after providing that UCIT could accelerate all indebtedness then owing to it by Spohn in the event of insolvency, further provided that UCIT "may require the respective amount on any chattel to be paid to it in cash. Until such payment we [Spohn] will hold *all proceeds* of sale separately and in trust for * * * Universal C.I.T." (Emphasis supplied.) Since Spohn owed UCIT upwards of $400,000 on all the chattels which it had financed at the time of the transfers, we think these 42 used cars were proceeds to which UCIT is entitled.

The other arguments advanced by the plaintiff-trustee to recover the value of these used vehicles have been disposed of in the preceding section of this opinion.

We hold that UCIT is entitled to retain the money received from the sale of the 42 used vehicles.

### MOTORS PARTS AND ACCESSORIES [26]

█ The Chattel Mortgage (Ex. I) and Loan Agreement (Ex. H) executed by Spohn created a security interest in Spohn's inventory of all parts and accessories now owned or which may hereafter be acquired. The Chattel Mortgage specifically covered "our complete inventory of all parts and accessories now owned or which may hereafter be acquired", and provided for their display and sale.

The security interest was perfected when UCIT filed a Financing Statement (Ex. J) in February, 1957, in the offices of the Secretary of the Commonwealth and the Prothonotary of Allegheny County covering "replacement parts and accessories" for new and used motor vehicles, trucks, tractors and trailers.

It seems to be stipulated that the Financing Statement (Ex. J) was filed as to items described in the Chattel Mortgage.[27]

Even if the stipulation is disregarded, we cannot agree with plaintiff-trustee's argument that the description in the Financing Statement is insufficient to perfect a security interest in these items.

U.C.C. § 9–402(1) provides:

"A financing statement is sufficient if it * * * contains a statement indicating the types * * * of property covered."

U.C.C. § 9–110 provides:

"For the purposes of this Article any description is sufficient whether or not it is specific if it reasonably identifies the thing described."

We find that the security agreements (Exs. I and H) and the Financing Statement reasonably identify the motor parts and accessories in Spohn's inventory, and that the description in the Financing Statement is sufficient to give notice to potential creditors. National-Dime Bank of Shamokin v. Cleveland Brothers Equipment Co., Inc., 20 Pa.Dist. & Co.2d 511 (1959). Therefore, UCIT is entitled to retain the money received from the sale of these items.

█ Judgment should be entered in favor of the plaintiff-trustee in the amount of $17,351.38. In addition, interest at the rate of 6% from May 19, 1959, the date of the commencement of this action, should be added to this sum. Kaufman v. Tredway, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904); Eisnaugle v. Blank, 125 F.Supp. 390 (E.D.Pa.1954).

---

26. Stipulated Facts, § 7(b), 18.

27. Stipulated Fact § 18 states: "The following items are as described in the *Chattel Mortgage (Exhibit I)* as to which Financing Statements (*Exhibit J*) were filed: A stock of motor vehicle parts and accessories (§ 7(b))."