William W. Serra, J.
This is an action brought against Dorothy Mae Sharp, as buyer, upon a retail installment contract to recover the amount due upon an automobile sales contract, and also to recover against the Marine Midland Trust Company of Western New York, the bank which provided floor-plan financing to the automobile dealer, on the theory of conversion for the reasonable market value of an automobile seized and sold by the said defendant bank. The action against Alfred M. Heintzman, individually, sounding in fraud, has been withdrawn from the consideration of the court by stipulation. The defendant, Dorothy Mae Sharp, has never been served and her whereabouts are unknown. The determinations are based on a nonjury trial of the issues.
Upon the evidence, in February, 1966, Mrs. Sharp contacted a car dealer in the City of Buffalo, Heintzman-McRae Motors, Inc., through its sales manager, William Peterson, and sought the purchase of a 1963 Chevrolet automobile. On February 16, 1966, she signed a printed form captioned ‘ ‘ car order ’ ’ which was received by the dealer subject to acceptance after a credit investigation by the plaintiff as proposed retail finaneer. The proposed purchase was, according to records of the plaintiff, phoned into for approval at 9:40 o’clock and approved at 10:30 o’clock by the plaintiff. Thereafter, a formal printed instrument entitled ‘ ‘ Retail Installment Contract ’ ’ was signed by Mrs. Sharp and by the dealer’s office manager. The contract follows the form requirements of article 9 of the Personal Property Law. It was dated February 16, 1966. On the following day, it was indorsed by the president of the dealer corporation to the plaintiff. Payment of the cash balance received by the dealer from the sale of the retail finance contract to the plaintiff was deposited by the dealer in its deposit account with the defendant bank on February 17, 1966. On February 24, 1966, a financing statement, form UCC-1, was filed in the office of the Clerk of the County of Erie to perfect the security interest of the plaintiff, as required by paragraph (d) of subdivision (1) of section 9-302 of the Uniform Commercial Code and paragraph (b) of subdivision (1) of section 9-401 of the Uniform Commercial Code. The retail installment contract contained, in a printed portion, an acknowledgment of delivery and acceptance of the car by the buyer. In fine print on the reverse side under the assignment portion of the contract, the dealer war *263 rants, among other things, that the buyer paid the down payment as stated in the contract. The contract, by its terms, provides for a trade-in which was actually delivered to the dealer at or about the time of signing the contract. It further provided for a cash down payment of $443, a payment of $100 to be due March 16, 1966, and a 30-payment deferred balance of $1,710.70. The $443 in cash was in fact not paid on the signing of the contract despite the form recitations. The arrangement between the sales manager and Mrs. Sharp was that she, as retail purchaser, was to make the cash payment when she received an income tax refund which she expected to receive in the immediate future and that the car was to be left on the lot until the cash payment was made. On or about March 18, 1966, and before the delivery of the car, the defendant, Marine Midland Trust Company of Western New York, seized all of the dealer’s automobiles then remaining on its lot, including the 1963 Chevrolet automobile described in the Sharp contract. The automobile was sold by the bank and the right to the proceeds is the issue to be determined herein.
In determining the rights of the parties, we are dealing with a question of first impression under the newly enacted Uniform Commercial Code as to which neither party nor the court has uncovered any decisive interpretive case law on the issues herein in this or any other jurisdiction governed by the new code. The Uniform Commercial Code has been law in New York since September 27, 1964 (L. 1962, eh. 553, as amd.). Situations such as this are, moreover, commonplace, according to counsel, in insolvent automobile dealerships and with major appliance dealers.
Various authorities have been cited by both parties with reference to venerable principles of contract law affecting the passage of title as claimed to be determinative of the issue of whether Mrs. Sharp was a “ buyer in the ordinary course of business ” under subdivision (9) of section 1-201 of the Uniform Commercial Code. These cases are largely distinguishable as being interpretations of repealed statutes not consistent with the broad changes of the Uniform Commerical Code or not otherwise applicable to this particular situation. Doyle’s Main Motors v. Davis (118 N. Y. S. 2d 867) applies to the literal interpretation of former rule 1 of section 100 of the Personal Property Law changed in format and over-all effect by subdivision (3) of section 2-401 of the Uniform Commercial Code in cases where title is determinative. Bank of Italy v. Merchants’ Nat. Bank (113 Misc. 314) similarly turns on former rule 1 of section 100 of the Personal Property Law and the *264 interpretation of the word ‘ ‘ guarantee ” as a contract consideration in relation to the passage of title rule. In Rand’s Discount Co. v. Universal C.I.T. Credit Corp. (9 N Y 2d 454) the determining factor is the failure of the defendant to file its conditional sales agreement as against a subsequently filed chattel mortgage from a dealer. First Nat. Bank of Binghamton v. Hermann Co. (275 App. Div. 415) is determinative of the issue of whether, in successive sales the second seller was a “dealer ” having an implied right to pass title to goods to a purchaser in the ordinary course of business under former section 69 of the Personal Property Law. Citizens Nat. Bank of Springville v. Conger (176 Misc. 1048) involves a fraudulent mortgage of a car by a fraudulent buyer and a salesman to his personal account completely out of authority and not comparable to these facts. Decker v. Furniss (14 N. Y. 611) merely rules as to completion of performance and passage of title, that title passes according to the intent of the parties. Empire State Type Founding Co. v. Grant (114 N. Y. 40) is to the same effect.
The New York State car registration was never transferred in the instant case. The fact that the delivery of such papers (Motor Vehicle Form MV-50) is evidence of the passage of title (Ferris v. Sterling, 214 N. Y. 249) does not control herein if the intention of the parties was to delay delivery of the otherwise “sold” car until a later date. The case merely confirms such intention as a rule of evidence.
This court is inclined to feel that, while title questions may be of significance in determining many issues under the Uniform Commercial Code, the theory of the act and its relation to the problem relegate the issue of title in this case to a subordinate position. The Uniform Commercial Code is the result of the rapid expansion of credit operations in the business world, both wholesale and .retail, to the position where traditional paper in the form of chattel mortgages, conditional sales forms, and even trust receipt floor planning do not, in large, fast-moving operations, meet the needs of a rapid flow of credit. The financing of inventories, particularly, has long baffled those accustomed to the country store with its annual inventory and slow movement of goods. A car dealer with hundreds of transactions a month, or a major appliance shop with transactions running into the thousands, must keep inventory controls by modern business machinery and have a constant flow of cash and credit. To meet these demands the Uniform Commercial Code provides for greater flexibility and, in some respects to the uninitiate, will, during the transition *265 of its ultimate form, seem to create new risks. To aid in this transition, guidelines of interpretation have been set forth in article 1 and carefully prepared definitions are found throughout the act. The purposes of the act, to be liberally construed, are specified as the simplification, clarification and modernization of the law governing commercial transactions to permit the continued expansion of commercial practices through custom, usage and agreement of the parties (Uniform Commercial Code, § 1-102). It further mandates a liberal administration of the act to the end that an aggrieved party may be put in as good a position as if the other party had fully performed without consequential, special or penal damages unless specifically provided for (Uniform Commercial Code, § 1-106). This is intended to negate unduly narrow or technical interpretations. (Official Comment in McKinney’s Cons. Laws of N. Y., Book 62½, Part 1, Uniform Commercial Code, p. 22.) Of critical interest to the question at hand is whether Mrs. Sharp was a buyer in the ordinary course of business out of inventory.
Under section 1-201 of the Uniform Commercial Code General definitions, such a buyer is defined in subdivision (9) as follows: “ (9) ‘ Buyer in ordinary course of business ’ means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. ‘ Buying ’ may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or total or partial satisfaction of a money debt. ’ ’
An “agreement” is defined in subdivision (3) as follows: “ (3) ‘ Agreement ’ means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1-205 and 2-208) Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1-103). (Compare ‘ Contract ’.) ”
A “contract” is defined in subdivision (11) as follows: “ (11) ‘ Contract ’ means the total legal obligation which results from the parties ’ agreement as affected by this Act and any other applicable rules of law. (Compare ‘ Agreement ’.) ”
*266 A “purchase” is defined in subdivision (32) as follows: “ (32) 1 Purchase ’ includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property.”
A “purchaser” is defined in subdivision (33) as follows: “ (33) ‘Purchaser’ means a person who takes by purchase.”
Subdivision (1) of section 2-106, containing further definitions with regard to “sales” under article 2, provides as follows: “ (1) In this Article unless the context otherwise requires ‘ contract ’ and ‘ agreement ’ are limited to those relating to the present or future sale of goods. ‘ Contract for sale ’ includes both a present sale of goods and a contract to sell goods at a future time. A ‘ sale ’ consists in the passing of title from the seller to the buyer for a price (Section 2-401). A ‘ present sale ’ means a sale which is accomplished by the making of the contract.”
The first sentence of section 2-401 of the Uniform Commercial Code limits this application and restricts its use as follows: “ § 2-401. Passing of Title; Reservation for security; Limited Application of this Section. Bach provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title.”
Other applicable definitions include section 1-204 of the Uniform Commercial Code:
“§ 1-204. Time; Reasonable Time; ‘Seasonably’”. (1) Whenever this Act requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.
“ (2) What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action.
“ (3) An action is taken ‘ seasonably ’ when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time.”
Subdivision (2) of section 1-205 of the Uniform Commercial Code provides: “ (2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing, the interpretation of the writing is for the court. ”
*267 Subdivision (5) of section 1-205 of the Uniform Commercial Code provides: “ (5) An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance.”
Applying the definitions and constructions indicated above, we find that Mrs. Sharp entered into a contract with the dealer to purchase the car by (1) delivery of her trade-in or exchange of property, (2) by cash, not actually paid but secured by a deferred delivery of the vehicle under a collateral oral agreement, (3) by cash, unsecured, to be paid at a later date, and (4) by a secured credit agreement sold by the dealer to the plaintiff. The dispute, arising out of the attempt to enforce the secured credit agreement or retail installment contract comes from the contention of the defendant bank that the entire transaction with Mrs. Sharp was executory only, that it was never consummated, title did not pass and it was null and void. The plaintiff, as a retail financier, on the other hand, contends that Mrs. Sharp was a buyer out of inventory in the ordinary course of business on her partly performed contract.
Applying the definitions to the evidence, it may be said that Mrs. Sharp entered into a specific written contract to purchase the car owned by the dealer. She gave valuable consideration in goods, she traded in her old Vehicle, and she signed a binding installment contract. She agreed to pay in cash a down payment and a deferred payment. By agreement, orally, she specified the course of her down payment, an anticipated income tax refund, and she certainly, in good faith expected to receive the car and to make her payments, upon the evidence (Uniform Commercial Code, § 1-102, subd. [3]). According to the testimony, she attempted to pay her cash deficiency a few days after the repossession by the bank, but, finding the car gone, abandoned her rights. The sales manager testified, without contradiction, that they frequently took and negotiated contracts with the car to be held for a time for the cash down payment, that it was common practice in his 20 years’ experience in the car business to take contracts without actual receipt of the recited cash down payment. He said he would fire a salesman who failed to do so and that in his experience and opinion a number of dealers would go out of business if they failed to follow this practice.
It is agreed by the parties that both the plaintiff and the defendant have formally perfected security interests and that the value of the collateral is $1,200. The question, therefore, becomes one of the priority of rights in the proceeds of the sale of the 1963 Chevrolet automobile. A security interest is *268 an interest in property which secures payment or performance of an obligation (Uniform Commercial Code, § 1-201, subd. [37]). Article 9, the security article, does not adopt a title or lien theory of security interests and rights. Obligations and remedies are not determined by the location of the title but rather on function, compliance with statutory requirements, and the nature of the transaction. (See “Official Comment” under section 9-101 of the Uniform Commercial Code, McKinney’s Cons. Laws of N. Y., Volume 62%, Part 3, pp. 318-321.) It is clear that the automobiles of the dealer were inventory held for sale to the public (Uniform Commercial Code, § 9-109, subd. [4]). Under the agreement between the defendant bank and the dealer, entitled ‘' Floor-Plan Agreement and Signatory Authorization (Inventory),” it is provided in the opening paragraph that the purpose is to finance the dealer’s acquisition and/or holding goods, i.e., motor vehicles for use arid resale in the course of the dealer’s business. It further provides in paragraph 8 as follows: “ (8) The Dealer agrees that when any item of Goods is sold or otherwise disposed of, the Dealer will account to the Bank for the Proceeds and will deliver to the Bank such Proceeds and such assignments or indorsements as may be requisite or requested by the Bank. The Bank shall be entitled to the Proceeds and shall have a security interest in them. Pending such accounting and delivery, the Dealer will hold the Proceeds in trust for the Bank as the Bank’s property, but at the Dealer’s risk, in the identical form received and separate and apart from the Dealer’s property. Proceeds as used herein means cash and non-cash proceeds, immediate and remote, and includes any debts owing to the Dealer by reason of the sale or other disposition of any Collateral and any cash, checks, trade-ins, accounts, chattel paper, notes, drafts, or other instruments whenever received and any items of Collateral disposed of by the Dealer which are returned to or repossessed by the Dealer.”
This is the very type of floating lien contemplated by section 9-204 of the Uniform Commercial Code and by section 9-205 of the Uniform Commercial Code, which offsets the restrictive rulings of Benedict v. Ratner (268 U. S. 353). Pursuant to this clause in the contract, the dealer received the funds obtained by assignments of Mrs. Sharp’s retail installment contract and deposited these moneys to the dealer’s account in the defendant bank. If it became commingled by the time of the insolvency, having, however, been traced into the bank account, it still remained a part of the gross remaining assets of the dealer enuring to the benefit of the bank on its seizure, under *269 the provisions of subdivision (4) of section 9-306 of the Uniform Commercial Code. The bank should, then, have a prior right to such funds even against the trustee in bankruptcy, since the claim is an equitable substitution authorized by the statute for the original inventory lien and relates back to the perfection of such lien Howarth v. Universal C. I. T. Credit Corp. (203 F. Supp. 279). This theory is extensively discussed by R. D. Henson in the Columbia Law Review (vol. 65, p. 232 [1965]).
Under paragraph 12 of its floor-plan agreement the bank is completely subrogated to all rights of the dealer in the business transactions and assets of the dealer on insolvency in implementation of the “floating lien” type transaction and for the protection of its rights thereunder. This includes its rights in and to the trade-in and its proceeds, if any, in the rights, if any, and in the contract rights of the dealer against Mrs. Sharp, had they been pursued on the contract, or for damages (Howarth, supra.).
By the same token, the plaintiff finance company, having furnished new value which has been paid to the dealer on the assignment, and having purchased the chattel paper in due course, is entitled to the returned or repossessed goods under paragraphs (b), (c) and (d) of subdivision (5) of section 9-306 and section 9-308 of the Uniform Commercial Code, provided, as in this case, its interest has been perfected (Uniform Commercial Code, § 9-306, subd. [5], par. [d]; § 9-302, subd. [1], par. [d]; § 9-401, subd. [1], par. [b]; § 9-312, subd. [1]). See, also, 2 Hawkland, Transactional Guide to Uniform Commercial Code, pp. 730-732, 700-701; 1 Anderson’s Uniform Commercial Code, pp. 562-566 inclusive, for discussions of this point.)
In making this determination, the court has, of course, by inference, determined that the buyer of goods was a buyer in the ordinary course of business out of inventory. A discussion of this has been left to the close of this memorandum by reason of the fact that the entire relation of the parties as indicated above relates to whether the irregularities of the transaction would make Mrs. Sharp other than such a buyer. As indicated at the beginning, section 1-102 of the Uniform Commercial Code requires a construction of all terms to carry out the underlying purposes and policies set forth in the statute, which is discussed at length in the practice commentaries of McKinney’s Consolidated Laws of New York and in the Official Comments. Any interpretation of the entire transaction, where both the retail financer and bank entruster acted in good faith, which became so technical as to abort the intention of the act and where a dealer has acted in *270 relation to all the other parties, buyer, entruster and financer, in such manner as to leave each with damage, would undermine the ultimate success of the act. If there is a usage of trade which exposes an entruster on floor plan to certain risks, these are risks against which he can guard by audits and accounting procedures or he can refuse to knowingly expose himself to the risk with the particular dealer. To fail to place the exposure of such risk with the entruster in such situation would make it impossible for retail finance companies to do business with any dealer unless the entruster were directly a participant. To hold otherwise, would expose the retail financer to a double loss as against at most a partial loss for both. The proliferation of paper work would be a giant step backwards in modern commercial practice. The court feels a buyer who makes a purchase on a printed form contract in good faith with a full understanding it is a binding contract, who knowingly signs a retail installment payment obligation and trades in an old car in addition must, certainly as to a retail financer furnishing new value on the strength of such contract and as to an entruster giving the dealer wide latitude of sale goods, be deemed a buyer in the ordinary course of business, without regard to the technicalities of when title is to pass pursuant to collateral oral agreements or as to time of delivery and without the necessity of determining whether such delay brings about technically, a bailment, a nondelivery, a repossession or whatever. (See Uniform Commercial Code, § 1-205, Practice Commentary, by Lester E. Denonn, McKinney’s Cons. Laws of N. Y., vol. 62½, part 1, p. 56, regarding the use of printed forms, usage of trade and side agreements.) This is especially so where article 9 of the Uniform Commercial Code provides such a finely integrated plan for the determination of the priorities and equities of the parties to secured transactions. This court does not, therefore, consider the title cases prior to the Uniform Commercial Code as controlling on the facts of the instant litigation.
The plaintiff shall have judgment against the defendant, Marine Midland Trust Company of Western New York, in the amount of $1,200 and interest from the 18th day of March, 1966.