**CAREY AVIATION, INC.,**
**Plaintiff/Appellant,**

v.

**GILES WORLD MARKETING, INC.,**
**Defendant/Appellee.**

**Bankruptcy No. 82–02005–HL.**
**Adv. No. A–83–0025–HL.**
**Civ. A. No. 84–1321–S.**

United States District Court,
D. Massachusetts.

Jan. 8, 1985.

Steven T. Hoort, Ropes & Gray, Boston, Mass., for plaintiff/appellant.

Ronald J. McDougald, Boston, Mass., for defendant/appellee.

## MEMORANDUM AND ORDER

SKINNER, District Judge.

This case involves the competing interests of a buyer and a secured lender in goods seized from the seller. Although it arises under the appellate jurisdiction of this court in bankruptcy, this appeal does not raise questions of federal bankruptcy law. Rather, the issues here arise under Articles 2 and 9 of the Uniform Commercial Code ("UCC") as adopted in Arizona.[1]

*Facts.*

Carey Aviation, Inc. ("Carey Aviation"), the plaintiff-appellant, is a Louisiana corporation operating a flying school and airplane rental business. Robert Carey, its president, contacted Varga Aircraft Corporation ("Varga"), an airplane manufacturer, in 1982 to discuss purchasing a two-seater aircraft from Varga, for use in Carey Aviation's business.

Carey Aviation and Varga entered into a purchase agreement on March 16, 1982, for the sale of a Varga aircraft, model 2150A, for $29,522.25, to be manufactured by Varga for Carey. The terms required payment to be made in three instalments, $10,000 upon contracting, $10,000 upon two-thirds completion of manufacture, and the balance upon notice that Varga was holding the completed goods for delivery. Delivery was to be taken at Varga's factory in Chandler, Arizona. The contract provided that Arizona law would govern.

Carey Aviation paid the initial deposit to Varga on April 9, 1982. Varga notified Carey by a letter dated May 20, 1982, that "Your aircraft VAC–189–82, N5601G will be at the two thirds point and the first aircraft on the line by May 25th. Please forward $10,000 deposit owed at the two thirds point." Carey did so, sending a check for $10,000 to Varga dated May 27, 1982.

At the time of contracting, Giles World Marketing, Inc. ("Giles"), the defendant-appellee, held a security interest in all assets of Varga, then existing or thereafter acquired, including work-in-progress, inventory and proceeds thereof. The agreement prohibited sale of any collateral without Giles' consent. There was no evidence presented to the Bankruptcy Court that

---

**1.** A.R.S. §§ 44–2301—44–2404, 44–3101—44–3153.

this interest was perfected by filing. On July 1, 1982, Giles seized the assets of Varga, including the aircraft mentioned in Varga's letter of May 20. Carey Aviation did not learn of the security interest of Giles until after the seizure of Giles' assets.

Robert Carey inspected the aircraft early in August, 1982. He found that it lacked a paint coat, certain pieces of optional equipment ordered in the contract, and the propeller, but was otherwise complete. Carey made a demand on Giles for delivery of the aircraft, offering to pay the remaining purchase price into escrow, to be reduced for nonconformities. Giles rejected this offer.

Carey then filed suit against Giles in Arizona state court to obtain possession of the aircraft. Giles subsequently filed a voluntary petition in bankruptcy under Chapter 11 in the District of Massachusetts and the state court proceedings were stayed. In Bankruptcy Court Carey renewed its demand for possession of the aircraft, contending that it was a buyer in ordinary course under the Arizona UCC with an interest superior to that of Giles. Robert Carey was the sole witness, and the parties submitted the bulk of the facts to the Bankruptcy Court on the pleadings. On April 1, 1983, the Bankruptcy Court denied relief to Carey and entered judgment in favor of Giles. *Carey Aviation, Inc. v. Giles World Marketing, Inc. (In re Giles World Marketing, Inc.)*, 29 B.R. 523 (Bankr.D.Mass.1983). Carey Aviation took a timely appeal from this decision.

*The Bankruptcy Judge's Decision.*

In the proceedings below, Carey Aviation contended and Giles disputed that Carey Aviation was a buyer in the ordinary course who took free of Giles' security interest in the aircraft under UCC § 9–307(1).[2] The bankruptcy judge determined, however, that it was not necessary to decide Carey Aviation's status. He reasoned

that Carey Aviation's right to reach the aircraft in a secured party's possession, even as a buyer in ordinary course, was defined by Article 2, not Article 9, and that Carey Aviation's rights thereunder were limited to the right to recover the goods from the seller in certain insolvency situations under § 2–502, the right to specific performance under § 2–716(1), and the right to replevy the goods from the seller under § 2–716(3). In other words, Carey Aviation's rights to obtain possession of the goods from Giles, the secured party, were limited to its rights to obtain possession from Varga, its seller. Concluding that Carey Aviation did not meet the conditions for possession under any of these provisions, the bankruptcy judge denied Carey Aviation's claim for possession from Giles and left it to a claim for damages or a claim to recover the purchase price under § 2–711(1), remedies again that arise against a breaching seller.

The bankruptcy judge resorted to Article 2 in the present case presumably because the contract of sale between Carey Aviation and Varga remained executory at the time of Giles' seizure of Varga's assets, and Article 2 governs a buyer's rights under an executory contract for the sale of goods. In looking to Article 2, the judge assumed that Article 2 is the exclusive source of a buyer's rights in goods, not only against the seller but against the world.

■ I reach a different result, namely, that the plaintiff's rights are governed by the interaction of Article 9 and certain sections of Article 2 not addressed by the bankruptcy judge. Article 2 "applies to transactions in goods" and chiefly regulates contracts of sale and the various steps of their performance. §§ 2–101, 2–102. Foreclosure of a security interest is not a "transaction in goods" and the rights of a buyer against a secured party are not

---

**2.** Section 9–307(1) as adopted in Arizona reads: § 44–3128. Protection of buyers of goods A. A buyer in ordinary course of business (paragraph 9 of § 44–2208) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

determined by the buyer's rights against the seller. The UCC makes this clear in two respects.

■ First, the language and policy of the three provisions of Article 2 on which the bankruptcy court relied, §§ 2–502, 2–716(1) and 2–716(3), do not support extension of their conditions to rights of the buyer against a third party in allegedly wrongful possession. Section 2–502 provides that upon the seller's insolvency the buyer may recover goods identified to the contract of sale from the *seller*. Section 2–716 generally, when read together with § 2–711(2), applies "[w]here the seller fails to deliver or repudiates"; that is, it concerns rights between the seller and buyer and does not contemplate recovery of goods from third parties. The right to a decree of specific performance afforded by subsection (1) of § 2–716 can arise only between the seller and the buyer, the parties to the contract. Moreover, a secured party has no obligation to tender its debtor's performance under a contract of sale, and consequently cannot be ordered to specifically perform that contract by delivering goods in its possession.

Section 2–716(3) gives the buyer a right of replevin from a breaching seller on two conditions: cover must be reasonably unavailable and the goods must be identified to the contract. These limitations do not extend beyond the buyer's claims against the seller for two reasons. Article 2 adopts a policy of emphasizing replacement of goods whenever commercially feasible and reserves replevin for use only when such replacement cannot be effected. The Code's purpose is to enable the buyer to obtain the goods he needs. *See* § 2–712 Comment 1. When the buyer's goal instead is to recover property he has paid for from a third party who has taken possession of it, the Code's policy of encouraging "cover" is inapplicable. Moreover, reading the "cover" limitation of § 2–716(3) as a condition for replevying goods from a secured party would yield an anomalous result in at least one instance. A buyer in ordinary course could not reach goods wrongfully possessed by a secured party without showing inability to cover.

Second, UCC Articles 2 and 9 both contain other provisions directly addressing the interests of buyers and secured parties in the same goods and providing the conditions upon which a buyer may assert its rights against the secured party. These are § 2–403(2) and its analogue § 9–307(1) embodying the UCC's policy on good faith purchase of goods, § 9–301(1)(c) governing the priorities between a secured party and a person not a buyer in ordinary course, and § 2–722 providing for suit by a buyer against a secured party or other third party. This last provision conditions the buyer's right to sue not upon possessory rights against the seller as provided in §§ 2–502 or 2–716 but upon "actionable injury" to the buyer caused by the third party's dealing with "goods which have been identified to the contract for sale" under § 2–501. To attain standing to sue under § 2–722, the buyer need only have the "special property" in the goods that arises from identification.

■ I conclude that a buyer's possessory rights against a seller under Article 2 are not the starting point for resolving competing claims between the buyer and a secured party who has seized the goods. The inquiry involves at least three steps. First, the point of departure is the question whether the goods have been identified to the contract of sale as determined under § 2–501. If so, then the buyer obtains a special property in them which, even though he has not yet accepted the goods, gives him a right of action under § 2–722 against a secured party who causes him actionable injury in dealing with the goods.

■ The second question is whether the seizure has caused the buyer actionable injury. In the present context, the seizure causes actionable injury if the buyer is a buyer in the ordinary course under § 1–201(9), since under § 9–307(1) the buyer has a right to take free of the secured party's security interest and consequently free of the secured party's right to foreclose on that interest. If the buyer is not a

buyer in ordinary course, its interest in the goods is inferior to the secured party's interest, and even if general law principles or Article 2 would permit him to replevy the goods from the secured party, he could only take them subject to the prior security interest. *Chrysler Corp. v. Adamatic, Inc.,* 59 Wis.2d 219, 208 N.W.2d 97 (1973); § 9–306(2).

Last, if the goods in question were identified to the contract of sale at the time of seizure, and the buyer claims them as a buyer in ordinary course taking free of the security interest encumbering the seller's rights in the goods, then a third question must be addressed: whether the law affords the buyer a remedy that includes reaching the goods themselves.

*Identification.*

█ Carey Aviation and Varga made no explicit agreement as to the time when identification of an aircraft to their contract was to occur. In the absence of explicit agreement, identification occurs under Article 2

> (a) when the contract is made if it is for the sale of goods already existing and identified;
>
> (b) if the contract is for the sale of future goods..., when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers....

§ 2–501(1). The sales contract here covered "future goods", § 2–105(2), since the aircraft had not been manufactured at the time the contract was made. Identification would occur when Varga "shipped, marked or otherwise designated" any aircraft as the goods to which the contract referred.

The bankruptcy judge made no finding on identification. He admitted evidence requiring a finding of identification, however. He admitted the letter dated May 20, 1982, from Varga stating "Your aircraft VAC–189–83, N5601G will be at the two thirds point and the first aircraft on the line by May 25th" and requesting payment of the

second $10,000 deposit, due under the contract upon two-thirds completion of the goods. Exhibit 3. He also admitted Carey's check for $10,000 dated May 27, 1982 bearing the notation "aircraft VAC–189–83, N5601G" and later negotiated by Varga. Exhibit 4.[3]

Though the aircraft was only two-thirds complete at the time, "there is no requirement that the goods be in a deliverable state or that all of the seller's duties with respect to the goods be completed in order for identification to occur". § 2–501 Comment 4. Accordingly, the record mandates the conclusion that Carey Aviation obtained a special property in the aircraft by identification through Varga's designation on May 21, 1982, well before Giles seized it.

*Buyer in Ordinary Course.*

█ Section 2–722(1) affords Carey Aviation standing to sue Giles on the basis of this special property, but only if Giles' dealing with the aircraft resulted in "actionable injury" to Carey Aviation. Carey Aviation is subordinate to Giles, a secured party, and suffered no *actionable* injury upon Giles' seizure, unless Carey Aviation qualified as a buyer in ordinary course at the time of that seizure. §§ 9–301(1)(c), 9–306(2), 9–307(1).

UCC § 1–201(9), A.R.S. § 44–2208, provides:

> Subject to additional definitions contained in the subsequent articles of this chapter which are applicable to specific articles, and unless the context otherwise requires, in this chapter:
>
> ... 9. "Buyer in the ordinary course" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in the ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker.... "Buying" may be for cash or by exchange of other property or on secured

---

**3.** Giles challenged these documents as hearsay. I find, however, that the evidence was admissible under F.R.E. 803(24) and 901(a) and that the bankruptcy judge did not abuse his discretion by receiving it.

or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.

There is no dispute that Carey Aviation acted in good faith and without knowledge that Varga's sale of the designated aircraft violated Giles' security interest in it, nor that Varga was in the business of selling goods of the kind. Carey Aviation meets the definition of a buyer in ordinary course, provided that it qualified as such at the time of Giles' seizure. The time when such status accrues is the key question here.

At least one court has held that a buyer does not qualify as a buyer in ordinary course until title to the goods passes. *Chrysler Corp. v. Adamatic, Inc.*, 59 Wis.2d 219, 208 N.W.2d 97, 12 UCC Rep. Serv. 849 (1973). The definition of a buyer in ordinary course, the Wisconsin Supreme Court declared, "when reasonably construed, limits buying in ordinary course of business to those situations where a 'sale', defined by section [2–106(1)] as 'the passing of title from the seller to the buyer for a price', has occurred." *Id.* at 239, 208 N.W.2d at 108, 12 UCC Rep.Serv. at 863. Title to the aircraft here would not have passed until Varga turned the aircraft over to Carey Aviation at the factory. § 2–401(3)(a). This never occurred. Thus, this approach would deny Carey Aviation the necessary status of "buyer in ordinary course".

Other courts, however, have rejected passage of title as the determinative test. *Jones v. One Fifty Foot Gulfstar*, 625 F.2d 44, 47 n. 3 (5th Cir.1980); *Rex Financial Corp. v. Mobile America Corp.*, 119 Ariz. 176, 178, 580 P.2d 8, 10 (Ct.App.1978); *International Harvester Credit Corp. v. Associates Fin. Serv. Co.*, 133 Ga.App. 488, 492–494, 211 S.E.2d 430, 433–434 (1974); *Wilson v. M & W Gear, Inc.*, 110 Ill.App.3d 538, 66 Ill.Dec. 244, 245–246, 442 N.E.2d 670, 672–673 (1982); *Chrysler Credit Corp. v. Sharp*, 56 Misc.2d 261, 270, 288 N.Y.S.2d

525, 534 (1968); *Holstein v. Greenwich Yacht Sales, Inc.*, 122 R.I. 211, 404 A.2d 842, 845 (1979).

In *Rex Financial Corp. v. Mobile America Corp.*, 119 Ariz. 176, 580 P.2d 8 (Ct. App.1978), a case arising under Arizona law, the law applicable here, the dispute arose between the buyer's purchase money lender and the seller's inventory financer. The buyer had executed an installment purchase agreement and a purchase money security agreement for purchase of a mobile home, but orally agreed to take delivery of the mobile home and make a down payment later. The seller's inventory financer meanwhile seized and disposed of the mobile home. The court held that the buyer was a buyer in ordinary course, determining that a retail sale had taken place. "[A] good faith purchaser who signs such a purchase money security agreement should be considered a buyer in the ordinary course 'without regard to the technicalities of when title is to pass pursuant to collateral oral agreements or as to time of delivery....'" *Id.*, 580 P.2d at 10, *quoting Chrysler Credit Corp. v. Sharp*, 56 Misc.2d 261, 288 N.Y.S.2d 525, 534 (1968). The court affirmed summary judgment in favor of the buyer's purchase money lender for conversion.

The Arizona court in *Rex Financial* rejected both delivery and passage of title as the point at which the status of buyer in ordinary course arises and, though dealing with identified goods, attached no significance to identification either. *Accord, Wilson v. M & W Gear*, 110 Ill.App.3d 538, 66 Ill.Dec. 244, 247, 442 N.E.2d 670, 673 (App. Ct.1982). Instead, the Arizona court emphasized the making of a contract typical in the seller's business and the buyer's expectations arising from that contract. The court concluded, with respect to the risk its decision would lay on a secured lender, that the secured lender was in a better position to guard against risk than the good faith purchaser or retail financer. *Id.*, 580 P.2d at 10.[4]

---

**4.** Because § 9–306(2) gives a secured party a     security interest in proceeds of any sale of col-

Based on *Rex Financial,* I conclude that Arizona law protects Carey Aviation's standing as a buyer in ordinary course under the facts of this case. The result is that Carey Aviation, as a buyer in ordinary course who took free of Giles' security interest in the designated aircraft under § 9–307(1), suffered injury actionable under § 2–722(1) from Giles' seizure of the goods.

*Recovery of the Aircraft Itself.*

■ The UCC does not provide a buyer in ordinary course with an avenue for obtaining possession of goods wrongfully detained by a secured party. As discussed above, § 2–716(1) governs a buyer's right to replevy goods only from his seller, and Article 9 on secured transactions does not address the matter.

Courts applying § 9–307(1) under the UCC in Texas and Florida have held the buyer of identified goods detained by a secured party to be entitled to possession merely upon establishing his status as a buyer in ordinary course. *Gary Aircraft Corp. v. General Dynamics Corp. (In the Matter of Gary Aircraft Corp.),* 681 F.2d 365, 377 (5th Cir.1982); *Jones v. One Fifty Foot Gulfstar,* 625 F.2d 44, 49 (5th Cir. 1980). These decisions are sound precedent, reaching the result on facts similar to the present case, and I will follow them.

Accordingly, I conclude that Carey Aviation is entitled to the relief requested in its complaint. The decision of the Bankruptcy Court is reversed and the case is remanded for determination whether the aircraft is currently in Giles' possession. If so, Giles shall be ordered to turn over possession of the aircraft and all related documents to Carey Aviation upon payment by Carey Aviation of the balance of the purchase price, less deductions for nonconformities. If the aircraft is no longer in Giles' possession, the court shall determine and award damages for conversion.

lateral, the secured party's interest is already protected. Indeed, in theory at least, a secured party can obtain a double recovery by seizing the goods and also any partial payments constituting proceeds in its debtor's hands. The

record here does not disclose whether Giles obtained any of the $20,000 Carey Aviation had paid Varga by the time Giles seized Varga's assets.