HENRY WILSON, Plaintiff-Appellee, *v.* M & W GEAR, Defendant-Appellant.

Third District   No. 81—724

Opinion filed November 24, 1982.

HEIPLE, J., dissenting.

James Patrick Murphy, of Flack, Kwacala & Murphy, of Macomb, for appellant.

Stanley L. Tucker and John R. Glidden, both of Hartzell, Glidden, Tucker & Neff, of Carthage, for appellee.

JUSTICE ALLOY delivered the opinion of the court:

The defendant, M & W Gear, Inc., appeals from a judgment of the trial court awarding $5,400 to the plaintiff, Henry Wilson.

There is no serious dispute in the relevant facts of this case. On March 7, 1981, Wilson purchased a 14-foot M & W grain drill from Colusa Farm Equipment, Inc. (Colusa). Wilson paid for this drill by trading in his old drill and tendering a check for $3,600. Colusa agreed to deliver a grain drill by May 1, 1981, though it did not have any drills in stock at the time of purchase. On March 20, M & W delivered two identical 14-foot grain drills to Colusa. The owner of Colusa told Wilson that his drill arrived, and on several occasions prior to April 20, 1981, the owner and Wilson discussed which attachments were necessary for the drill as well as delivery arrangements for the drill. All M & W drills have individual serial numbers. The two drills that M & W delivered to Colusa were numbered 1018 and 1057. Wilson's documentation did not indicate a particular serial number on the drill during his subsequent visits to Colusa.

M & W is a manufacturer of farm equipment. It furnished farm equipment to Colusa under a security agreement. Under the terms of the agreement, Colusa remits payments to M & W upon sale of equipment to a customer. M & W in turn maintains a security interest in the inventory of Colusa. M & W's security agreement with Colusa was properly filed with the Secretary of State and with the recorder of Hancock County. As part of its procedure to enforce the security agreement, M & W contacted Colusa to make an inventory. Colusa had the two grain drills in its inventory. On March 31, M & W's sales

manager determined that one of the drills, serial number 1057, had been sold by Colusa and that M & W had been reimbursed for this drill. This was not the drill that is subject to dispute in this case. An identical drill, serial number 1018, was listed as unsold on March 31. On April 20, M & W seized this drill under its security agreement with Colusa. After Wilson made an unsuccessful demand upon M & W for the drill, he filed this action in the trial court. Both parties stipulated at trial that the grain drill is no longer in the defendant's possession. After the hearing, the trial court awarded the plaintiff $5,400, representing the value of the grain drill. The defendant now appeals.

The initial issue the parties address in their appeal to this court is whether the grain drill that M & W seized was sufficiently identified or related to the Wilson-Colusa contract such that Wilson can maintain an action for replevin or damages. A plaintiff can sue in replevin only for property which is capable of identification and return. A plaintiff may, however, also proceed under the original replevin complaint for the value of the property not found or delivered. (*S. T. Enterprises, Inc. v. Brunswick Corp.* (1974), 57 Ill. 2d 461, 469, 315 N.E.2d 1.) The court may award the value of the property to the plaintiff only if the property is not found or returned. (*Brunswick Corp.*, citing with approval *Kehoe v. Rounds* (1873), 69 Ill. 351.) Although the defendant does not clearly argue the point, its initial contention appears to be that the plaintiff failed to establish that the drill in question was identified as the drill referred to in the contract. Therefore, the argument goes, the plaintiff is not entitled to maintain an action for replevin. The failure of his action for replevin would deny him any right to an award for the value of the drill bought and paid for by plaintiff.

Although the defendant's statement of the law on this point may be correct, it does not determine the resolution of this appeal. Wilson did not merely try to replevin the drill. He also asked, in the alternative, for damages for the wrongful taking and detention of the drill. This alternative does not depend upon a right to maintain an action for replevin. Undoubtedly, specifying the prayer for relief as a separate and alternate count of his complaint would have led to less confusion. Failure to draft this alternative clearly, however, is not fatal to Wilson's claim for damages.

■ The issue becomes, therefore, whether Wilson is entitled to the value of the drill. "As a general rule, the holder of a perfected security interest has an interest in the secured property, and the proceeds from the sale thereof, which is superior to the interests of unse-

cured creditors of the debtor and subsequent purchasers of the secured property." (*Herman v. First Farmers State Bank* (1979), 73 Ill. App. 3d 475, 477, 392 N.E.2d 344.) Under section 9—307(1) of the Uniform Commercial Code, however, a buyer in the ordinary course of business takes free of a security interest created by his seller even though the buyer knows of its existence. (Ill. Rev. Stat. 1979, ch. 26, par. 9—307(1).) A buyer in the ordinary course of business is a person who "in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ***." (Ill. Rev. Stat. 1979, ch. 26, par. 1—201(9).) Whether a person is a buyer in the ordinary course of business is a question of fact.

In the case at bar, the trial court's ruling is amply supported by the evidence. It is undisputed that Wilson purchased a drill from Colusa. Colusa is in the business of selling farm equipment and the particular sale to Wilson was normal and typical of the type of sales made in this trade. M & W delivered a drill to Colusa, and it became a part of Colusa's inventory. Moreover, there is no evidence that Wilson knew of M & W's security interest or, if he did, that he knew that the sale of the drill was in violation of any security agreement between Colusa and the defendant.

The facts of this case make it indistinguishable from *Herman*. In *Herman*, the plaintiff bought 20 tons of liquid nitrogen solution from a dealer. The bank had a perfected security agreement in the inventory of the dealer. The plaintiff paid the purchase price and agreed with the dealer to delivery at a later unspecified date. When the dealer defaulted on the security agreement, the bank seized the dealer's inventory, including 500 tons of the liquid nitrogen solution. The plaintiff never received the 20 tons she ordered and sued the bank for the value of the solution. On appeal, this court ruled the plaintiff was a buyer in the ordinary course of business who took free from the bank's security interest.

M & W attempts to distinguish *Herman* from the instant case. In *Herman*, M & W argues, the dealer could have complied with the contract by delivering any accumulation of 20 tons of solution. In this case, however, each drill is separate and individually marked with an identifying serial number. This is a distinction without a difference. In *Herman*, this court placed no reliance on the fact that the goods were not readily and separately identifiable. Moreover, the question of identification is irrelevant to the issue of whether a purchaser is a buyer in the ordinary course of business. *Herman*.

Antiquated concepts of "title" do not control the resolution of this appeal. In fact, any reliance upon the location in this case would be contrary to the thrust of the Uniform Commercial Code and to modern case law and commentary interpreting the Code. The Code has diminished drastically the importance of title. In particular, the question of whether title has passed is immaterial to the protections afforded to a buyer in the ordinary course of business. Under article II of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 2—401), "Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to goods except where the provision refers to such title." The Illinois Code Comment explicitly explains the reduced importance of title in determining a buyer's right to replevin:

> "Article 2 deals with issues between buyer and seller in narrow terms rather than on the broad term of whether or not title to the goods has passed. Official Comment 1. The concept of title is thus subordinated under the Code. Instead of approaching a sales problem by first locating title to the goods, as under the Sales Act, a lawyer's approach starts with an analysis of the problem in terms of these narrow issues (i.e., risk of loss, insurable interest, seller's right to price, buyer's right to specific performance or replevin, and rights of creditors of seller and of buyer) and an ascertainment of whether the Code deals specifically with its issues." (Ill. Ann. Stat., ch. 26, par. 2—401, Illinois Code Comment, at 312-13 (Smith-Hurd 1963).)

In the instant case, section 9—307 of the Code specifically deals with the buyer's rights to the goods.

Moreover, to avoid any confusion on the matter, the Code eliminates the importance of title in the law of secured transactions: "Each provision of this Article [article IX] with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." (Ill. Rev. Stat. 1981, ch. 26, par. 9—202.) The comments to this section remove all doubt as to its full import. "This section de-emphasizes whatever significance the concept of 'title' may have had under pre-Code chattel security law." (Ill. Ann. Stat., ch. 26, par. 9—202, Illinois Code Comment, at 103 (Smith-Hurd 1974).) The official comments of the UCC are even more specific: "The rights and duties of the parties to a security transaction and of third parties are stated in this Article without reference to the location of 'title' to the collateral." Ill. Ann. Stat., ch. 26, par. 9—202, Uniform Commercial Code Comment, at 103 (Smith-Hurd 1974). See

also 1 Anderson, Uniform Commercial Code sec. 1–201:19 (1970).

■ Furthermore, there is no need for the goods to be identified to the contract before section 9–307 will protect this plaintiff. Although many of the cases involving section 9–307 dealt with goods identified, most courts have not placed any critical emphasis upon that fact. (See, *e.g., Chrysler Credit Corp. v. Sharp* (1968), 56 Misc. 2d 261, 288 N.Y.S.2d 525; *Rex Financial Corp. v. Mobile America Corp.* (1978), 119 Ariz. 176, 580 P.2d 8. But see *Holstein v. Greenwich Yacht Sales, Inc.* (1979), ____ R.I. ____, 404 A.2d 842 (court ruled upon identification to characterize purchaser as a buyer in the ordinary course of business).) Identification of goods to a contract is relatively unimportant under the UCC. (T.M. Quinn, Uniform Commercial Code Commentary and Digest par. 9–307(A)(8) (1982 Cum. Supp. No. 1).) The official comments to section 2–501 of the Code—concerning the identification of goods—demonstrates the unimportance of identification. In Comment 5, for example, the Code drafters explained that:

> "Undivided shares in an identified fungible bulk, such as grain in an elevator or oil in a storage tank, can be sold. The mere making of the contract with reference to an undivided share in an identified fungible bulk is enough under subsection (a) to effect an identification if there is no explicit agreement otherwise. The seller's duty, however, to segregate and deliver according to the contract is not affected by such an identification but is controlled by other provisions of this Article." (Ill. Ann. Stat., ch. 26, par. 2–501, Uniform Commercial Code Comment, at 349-50 (Smith-Hurd 1963).)

In *Martin-Marietta Corp. v. N.J. National Bank* (3d Cir. 1979), 612 F.2d 745, 750, the court observed that the "crux of the passage (Comment 5) is that if a seller removes some of the fungibles and later replaces them, that should not undercut the policy favoring identification, probably because such conduct is quite natural with fungibles and cannot be taken as an intent to negate the buyer's interest in them."

We are not arguing, of course, that grain drills are fungibles. There is no substantial distinction, however, between buying 20 tons of a fungible out of a dealer's 500-ton inventory (as in *Herman*) and buying one grain drill out of a dealer's two-drill inventory. The case law considers the goods in the first scenario as "identified" to the contract. We see no reason to give the purchaser in the second instance any less protection. Rather than distort the meaning and purpose of identification in the Code, it is better to recognize its relatively limited importance in the scheme of the UCC. In particular,

substantive rights under section 9—307 should not turn upon a concept so elusive and ephemeral.

Not surprisingly, neither *Holstein, Martin-Marietta* nor the defendant offer any reasonable justification for enhancing a relatively inconsequential concept to a position of such overwhelming importance. In regard to *Herman*, we saw no need for the seller of a particular group of gallons of liquid nitrogen to label it "Mrs. Herman's." In fact, even if the dealer had done so, he could have sold that group to someone else and the buyer still would have an interest in the remaining bulk of nitrogen. In other words, even if we adopt identification as a prerequisite to protection of buyers in the ordinary course of business, the Code would not change the result in *Herman*. As we have already stated, there is no logical reason to afford the purchasers of appliances or equipment any different protection.

The holding of *Troy Lumber Co. v. Williams* (1971), 124 Ga. App. 636, 185 S.E.2d 580, does not change our view of the law. The holding in *Troy* is not on point and the opinion—if anything—supports our view. In *Troy*, the plaintiffs placed $600 with a mobile home dealer as a down payment on a home. The contract did not specify any particular mobile home. The manufacturer of the mobile homes retained a security interest in the dealer's inventory under a floor plan that was similar to the scheme in the case at bar. Subsequently, the dealer embezzled all the funds of the business. The manufacturer, not having been paid for any of the homes that it delivered to the dealer, seized the mobile homes in inventory. The plaintiff sued the manufacturer for a refund of the $600, claiming he was a buyer in the ordinary course of business.

Although the court rejected the plaintiff's arguments, the court's opinion fully supports our holding in the instant appeal:

> "Plaintiffs' main contention is that they are buyers in the ordinary course of business, and therefore take the property free of a security interest created by the seller. (UCC citations omitted.) *This would be a valid argument if the plaintiffs were in fact buyers, i.e., if they were either attempting to enforce the contract of sale or defending their right to free possession of the property after having performed under the contract.* However, the plaintiffs have, in effect, rescinded this contract by demanding refund of their down payment. They are not asking for a mobile home, they are asking for $600." (Emphasis added.) (124 Ga. App. 636, 637-38, 185 S.E.2d 580, 582.)

The court characterized the plaintiffs as lien creditors of the dealer who held an inferior position to the manufacturer.

*Troy* explicitly recognizes the rights of a purchaser, standing as a buyer in the ordinary course of business, to sue the secured creditor which seizes the dealer's inventory. Unquestionably, the plaintiff in the instant appeal is attempting to enforce the contract of sale and he fully performed his part of the contract. He paid for a grain drill and seeks to obtain a grain drill. Most significantly, *Troy* implicitly rejects any necessity for identification as a prerequisite to relief and protection under section 9—307.

The appellants in the case at bar invite the court to reconsider *Herman* and resurrect the argument that protecting the buyer will make security on an inventory an unworkable concept. We decline the invitation. All courts that have faced this problem have reached the same conclusion: "If there is a usage of trade which exposes an entruster on floor plan to certain risks, these are risks against which he can guard by audits and accounting procedures or he can refuse to knowingly expose himself to the risk with the particular dealer." (*Chrysler Credit Corp. v. Sharp* (1968), 56 Misc. 2d 261, 270, 288 N.Y.S.2d 525, 534, quoted with approval in *Herman*.) The secured party is in an excellent position to know whether an item has been sold. In the case at bar, for example, the manufacturer could have required copies of all orders before shipment to the dealer. Upon receiving the orders, the manufacturer could have assigned particular grain drills to particular retail purchasers. Failing this simple routine, the manufacturer could have examined Colusa's records to determine how many grain drills had been paid for but were currently undelivered. M & W would have discovered that two grain drills were paid for, that these two drills had not yet been delivered to the purchasers and that two drills were still in inventory. This information is certainly sufficient to inform the manufacturer that the two drills in inventory have been sold. Requiring a serial number on each order form would be superfluous. Even if these records are unavailable, Colusa's and M & W's failure to utilize modern accounting and auditing procedures can hardly be a justification for prejudicing the retail purchaser's rights under section 9—307. Finally, if any particular dealer is unreliable in its inventory or accounting practices, the manufacturer can refuse to expose itself to those risks.

*Herman* is directly on point for this appeal. It is in accord with modern case law and understanding of the Uniform Commercial Code. More importantly, *Herman* was decided by a unanimous panel of this court only three years ago, and it is based on a sound and rational policy of protecting innocent purchasers from the zealous and unilateral actions of secured creditors of the dealers. There is no sensible

reason to deviate from *Herman*, especially where the retail purchaser has fully performed his obligations of the contract. We hold, therefore, that when a person contracts to buy goods and those goods are in the dealer's inventory, awaiting delivery or being prepared for delivery, that purchaser is a buyer in the ordinary course of business within the meaning of section 9—307. Title to the goods does not have to pass to the purchaser nor do the goods need to be identified by number before section 9—307 will protect the retail purchasers.

For the reasons stated, the judgment of the circuit court of Hancock County is affirmed.

BARRY, P.J., concurs.

JUSTICE HEIPLE, dissenting:

This is a suit for replevin brought by a farmer against a farm implement manufacturer. The controversy arose after the farmer, Wilson, had prepaid an order to a farm implement dealer, Colusa, for a grain drill that was not in stock at the time of the order. The dealer was to obtain a drill of a certain make and type and deliver it to the farmer. Later, however, and before a drill was delivered to Wilson, the dealer inventory was repossessed by the manufacturer, M & W Gear, pursuant to a security agreement. At the time of repossession, the inventory repossessed included a grain drill of the make and type ordered by Wilson. Wilson claimed that it was his. Wilson's replevin suit also included a claim for damages resulting from the retention of the chattel by M & W Gear. The trial court found for Wilson and awarded him a judgment for the value of the grain drill, but denied his claim for damages for retention. It was not possible for the trial court to award the drill itself since it was no longer in defendant's possession.

M & W Gear appeals.

In a carelessly reasoned opinion, the majority chooses to affirm and, in so doing, takes off on a discussion of the Uniform Commercial Code that defies rational analysis, states bad law, and republishes an earlier erroneous decision of this court in the 1979 case of *Herman v. First Farmers State Bank* (1979), 73 Ill. App. 3d 475. Such distortions cannot be endorsed and should not go unremarked.

Article 9 of our Uniform Commercial Code establishes a priority system for determining the rights of parties who claim competing interests in secured property. (Ill. Ann. Stat., ch. 26, art. 9, Introductory Comment (Smith-Hurd 1979).) As a general rule, the holder of a

perfected security interest has an interest in the secured property, and the proceeds from the sale thereof, which is superior to the interests of unsecured creditors of the debtor and subsequent purchasers of the secured property.

"Sec. 9—201. General Validity of Security Agreement. Except as otherwise provided by this Act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." (Ill. Rev. Stat. 1979, ch. 26, par. 9—201.)

However, the principal exception to this general rule is found in section 9—307(1), which provides:

"Sec. 9—307. Protection of Buyers of Goods. (1) A buyer in ordinary course of business (subsection (9) of Section 1—201) *** takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." (Ill. Rev. Stat. 1979, ch. 26, par. 9—307(1).)

The definitional provision of the Code states:

" 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind ***." (Ill. Rev. Stat. 1979, ch. 26, par. 1—201(9).)

"A 'sale' consists in the passing of title from the seller to the buyer for a price. ***" (Ill. Rev. Stat. 1979, ch. 26, par. 2—106(1).)

"Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell." (Ill. Rev. Stat. 1979, ch. 26, par. 2—105(2).)

The manner of identification of goods is as follows:

"(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are non-conforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs

    (a) when the contract is made if it is for the sale of goods already existing and identified;

(b) if the contract is for the sale of future goods other than those described in paragraph (c), when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers." (Ill. Rev. Stat. 1979, ch. 26, par. 2—501(1).)

Identification is required for title to pass:

"Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2—501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this Act. *** Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." (Ill. Rev. Stat. 1979, ch. 26, par. 2—401(1).)

Delivery passes title:

"Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

\* \* \*

(b) if the contract requires delivery at destination, title passes on tender there." Ill. Rev. Stat. 1979, ch. 26, par. 2—401(2).

The foregoing is the statutory law applicable to this transaction. What are the facts? The record discloses that on or about March 7 to March 9, 1981, Wilson paid Colusa $3,600 in cash and gave them his old drill which Colusa valued at $1,800 for tradein purposes. This total of $5,400 was to cover the purchase price of a new 14-foot M & W grain drill which was not then on the premises of Colusa but was to be obtained by Colusa for Wilson. Wilson, testifying as to the agreement, stated: "Well, the agreement was that [Colusa] was supposed to deliver the drill before season or May 1st, I believe, it was to be delivered to my farm." This testimony supplements and corroborates the dealer's receipt to Wilson on March 7 and Wilson's $3,600 check to Colusa dated March 9. Thus, it is seen that the transaction of March 7-9 amounted to the placing of a prepaid order for future delivery of a particular *type* of farm implement but not a *particular* imple-

ment. The implement was not identified as to serial number, color, nor, in fact, in any other way except as to make and type. Indeed, it could not have been identified as it was not on the premises of Colusa at such time. Presumably, any drill of the make and type ordered that Colusa would have procured would have been satisfactory. The new drill was to become Wilson's when it was delivered to Wilson at his farm. With the payment and order which Wilson gave to Colusa, Wilson became a contract buyer and an unsecured creditor of Colusa to the extent of $5,400.

For its part, M & W Gear, the manufacturer, supplied farm equipment on credit to Colusa, the dealer, for sale to customers of Colusa. To secure this extension of credit, M & W had an agreement with Colusa commonly known as a floor plan. Under this floor-plan agreement, it became Colusa's obligation to remit payment to M & W whenever an included item of inventory was sold. Colusa also executed a promissory note and a security agreement in favor of M & W. Under the terms of the security agreement, M & W received a security interest in all of Colusa's inventory, equipment, and all cash and noncash proceeds arising out of the sale of M & W products sold by Colusa. The agreement further spelled out that such "proceeds" included all cash, chattel paper, contract rights and instruments presently owned or later acquired by Colusa upon the sale of any item of inventory. Pursuant to statute, M & W perfected this security interest with a filing in the office of the recorder of deeds of Hancock County, which was the site of the transaction. Ill. Rev. Stat. 1979, ch. 26, pars. 9—401, 9—402.

On March 20, M & W delivered two identical 14-foot grain drills to Colusa of the make and type ordered by Wilson. All M & W drills have individual serial numbers and these two were numbered 1018 and 1057. On March 31, M & W determined that drill number 1057 had been sold by Colusa and payment rendered to M & W. On April 20, M & W seized drill 1018 under its security agreement and further disposed of it. After Wilson made an unsuccessful demand upon Colusa for delivery of the drill he had ordered, he brought this replevin action against the manufacturer.

The evidence concerning whether drill number 1018 was identified to the contract of sale between Colusa and Wilson is in dispute. Wilson testified that after he was told by his neighbor, Dennis Pilkington, that his drill was in, that he went over to Colusa and looked at a drill there. He claims there were some things he felt needed to be done before delivery. A U-bolt needed to be re-

placed; the tires needed to be checked; an acre meter and scratches needed to be attached. The record is unclear if these concerns were communicated to anyone at Colusa and if they agreed to do them to the drill now identified as number 1018. The record does not clearly support the proposition that anyone at Colusa told him his drill was in nor the drill that was his is the one now identified as number 1018. Wilson acknowledged at trial he gave a deposition shortly after the seizure by M & W. He admitted that in the deposition he said that no one called him from Colusa to say his drill was in. While Wilson had tried to telephone them when he heard his drill was in, he was never able to make contact with anyone at Colusa. In short, there is no solid evidence in the record to show that grain drill number 1018 was designated or marked by Colusa as the one to fill their contract of sale with Wilson. Wilson never claimed that he was told by Colusa that the drill grain number 1018 was his drill.

The trial judge, although finding that Wilson was a buyer in the ordinary course of business, made no finding that drill number 1018 was identified as to Wilson. Wilson offered the only testimony pointing towards identification and it was self-serving, equivocal and impeached. In short, the judge did not find identification. And if he had so found, the evidence would not have supported it.

In a total misconception of the law, the majority opinion says that such lack of identification makes no difference; that, "Although the defendant's statement of the law on this point may be correct, it does not determine the resolution of this appeal." Nothing could be further from the truth. For if the drill had never been identified as to Wilson, then Wilson could have no interest in it. Certainly, Wilson had a valid claim against Colusa for breach of contract when May 1 came and went and the ordered drill was not delivered to him. That is clear. But that is not what this lawsuit is about. This lawsuit is a replevin suit to recover a particular drill that allegedly belonged to Wilson. If it wasn't Wilson's drill, it wasn't subject to replevin. And if it wasn't subject to replevin, M & W wasn't liable for the value of the drill which they repossessed from Colusa. It is also notable that on April 21, when M & W repossessed drill 1018, there were 10 days still remaining on Wilson's contract with Colusa before delivery of a 14-foot M & W drill had to be made. Wilson had no clear right to insist on delivery of any drill on April 21, much less drill 1018.

Assuming *arguendo* that fire or act of God had destroyed the

drill or that the drill was stolen during the period it was on the premises of Colusa, would the loss have fallen on Wilson? Clearly not. Wilson had a contract of purchase for delivery of a 14-foot M & W drill on or before May 1. His contract did not call for drill 1018 nor for any other specific identifiable chattel. Rather, it called for the delivery of a particular make and type of drill on or before May 1. Wilson had a right to insist on performance of such contract by Colusa and could have maintained a suit for breach of contract against Colusa if delivery failed. Since drill 1018 was not identified as to him, he would not have had to accept the loss if it had been destroyed on Colusa's sales lot or been stolen. Likewise, it is clear that he had no right to replevin that item.

Having dismissed out of hand the significance of identification, the majority concludes that the only issue in the case is whether Wilson was a buyer in the ordinary course of business. Finding that he was such a buyer and relying on *Herman,* the majority affirms the judgment of the trial court in favor of Wilson. Such finding cannot survive analysis.

Section 9—307(1) of the Uniform Commercial Code which protects a "buyer in the ordinary course of business" cannot be said to protect all persons who have paid money to a seller. There must be a buyer. The very term presupposes a sale as shown by the definition of such buyer in section 1—201(9) where the word "sale" is used. Merely paying the money does not constitute a sale. At some point in time there must be a transfer of ownership, at which time the person becomes a buyer. A sale consists of the "passing of title from the seller to the buyer for a price." (Ill. Rev. Stat. 1979, ch. 26, par. 2—106(1).) "Title to goods cannot pass under a contract for sale prior to their identification to the contract." (Ill. Rev. Stat. 1979, ch. 26, par. 2—401(1).) Thus, prior to identification, no property interest could pass to Wilson so as to bring him within the protection of a buyer in the ordinary course of business.

Although the question of title passage is of prime importance in determining the respective interest of Colusa's customers and Colusa's secured creditor, the Uniform Commercial Code has, to a great extent, softened the concept of title through the use of specific provisions determining the rights and duties of buyers and sellers with regard to such things as risk of loss and insurable interest. Even under those specific provisions, however, the Uniform Commercial Code does not impose the risk of loss on the buyer until tender of delivery is made to the buyer (Ill. Rev. Stat.

1979, ch. 26, par. 2—509(3)), nor does it give buyer an insurable interest until goods are existing and identified. (Ill. Rev. Stat. 1979, ch. 26, par. 2—501.) In fact, as logic would require, the Code provides that *no interest* in specific goods can pass before the goods are (1) existing, and (2) identified. The Uniform Commercial Code's definition of goods provides:

> "Goods must be existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell." Ill. Rev. Stat. 1979, ch. 26, par. 2—105(2).

The plaintiff could not be a buyer in ordinary course of business until there were goods which were existing and identified to comprise the subject matter of the purchase. In this case, since no identification took place, no interest in any particular item of inventory passed to plaintiff. Although Wilson's contract with Colusa was a valid contract, his rights to the Colusa inventory are inferior to the rights of M & W as the holder of a perfected security interest.

As already noted, the Code provides that no passage of title could occur under the facts of this case, as it says that title to goods cannot pass under a contract for sale prior to their identification to the contract. Passage of title to goods would be controlled by the explicit agreement of the parties, and as there is no explicit agreement regarding title, title passes to the buyer at the time and place which the seller completes his performance with reference to physical delivery of the goods (Ill. Rev. Stat. 1979, ch. 26, par. 2—401(2)) and, in particular, if the contract requires delivery at destination, title passes on tender there. (Ill. Rev. Stat. 1979, ch. 26, par. 2—401(2)(b).) It will be recalled that the contract between Wilson and Colusa called for delivery of the drill to Wilson's farm on or before May 1. Such delivery never took place, and no identification under the Code took place on the premises of Colusa prior to repossession.

There are few cases squarely on the point. One case which appears precisely on point is *Troy Lumber Co. v. Williams* (1971), 124 Ga. App. 636, 185 S.E.2d 580, where plaintiffs made a down payment of $600 to a mobile home dealer. There were mobile homes in the lot, but the payment was not on a specific mobile home. The court held that plaintiffs were not "buyers in ordinary course" and the security interest was held to be prior. In *Draper v. Minneapolis-Moline, Inc.* (1968), 100 Ill. App. 2d 324, a buyer

of a tractor took prior to the secured party because "there was a complete and sufficient identification of the tractor to the contract." In that case a particular tractor was shown to the purchaser who was told that it was his. This case clearly recognizes the principle that there must be an identification and appropriation to the contract.

The majority opinion, as a practical matter, makes the concept of security on inventory an entirely unworkable concept. It makes any inventory on hand subject to the claims of unsecured buyers of "future goods," and it makes these goods subject to such claims without regard to when the goods came into possession of the dealer, without regard as to whether they have been identified as to the contract, and without regard to delivery conditions of the contract. The secured party cannot know on repossession of a particular item whether one or several unknown persons may have a prior claim to that particular item. After repossession and sale by the secured party, claims by one or more previously unknown buyers may be filed against the proceeds. Suppose, for instance, that Colusa had contracted to sell an undetermined number of drills for future delivery. Suppose further that one drill comes into inventory and is repossessed and sold by the manufacturer prior to identification or delivery to any customer. The repossessing secured party would have to sit on the proceeds until the four-year statute of limitations (Ill. Rev. Stat. 1979, ch. 26, par. 2—725) expired in order to know that it was entitled to keep the money. They would have no way of knowing how many claims existed against the repossessed inventory or when, or if, or in what manner they would be presented. That is the evil of the ruling in this case and that is the evil of *Herman*. The majority says that *Herman* is indistinguishable from this case. That is true. *Herman* was wrong and pronounced bad law. There is no need to dissect *Herman* here. Such analysis would be a reiteration of my dissenting opinion in this case. Errors once made, if recognized, need not be repeated. I would not follow *Herman* and I would not affirm the judgment in this case. Rather, I would direct the entry of judgment for the secured creditor.