**In re DOUGHTY'S APPLIANCE, INC., Debtor.**

**John Mitchell, Trustee, Plaintiff,**

**v.**

**Transamerica Commercial Finance Corporation and Amana Finance, Defendants.**

**Bankruptcy No. 398–34034–rld7. Adversary No. 99–3032–rld.**

United States Bankruptcy Court, D. Oregon.

July 22, 1999.

Brad T. Summers, Portland, OR, for plaintiff.

Thomas A. Gerber, Portland, OR, for defendant.

## MEMORANDUM OPINION

RANDALL L. DUNN, Bankruptcy Judge.

This adversary proceeding has risen from the wreckage of the Doughty's Appliance, Inc. bankruptcy case, Case No. 398–34034–rld7. The following are designated as the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, applicable in this adversary proceeding under Rule 7052 of the Federal Rules of Bankruptcy Procedure, in support of the court's grant of partial summary judgment at the hearing (the "Hearing") on the plaintiff chapter 7 trustee's ("Trustee") Motion for Summary Judgment, held on June 17, 1999. These findings and conclusions are based upon the record, consisting of the pleadings and affidavits on file in Adv. No. 99–03032–rld, and the arguments of counsel for the parties at the Hearing.

## FACTUAL BACKGROUND

Doughty's Appliance, Inc. ("Doughty's") was in the business of selling home appliances and electronic equipment at retail. Transamerica Commercial Finance Corporation ("Transamerica") and Amana Finance ("Amana") provided inventory floor financing to Doughty's. Transamerica and Amana perfected security interests in Doughty's inventory and proceeds with Uniform Commercial Code ("UCC") financing statements filed in Oregon. After Doughty's defaulted in its payments to Transamerica and Amana on their inventory financing loans, Transamerica and Amana, during the period May 7, 1998, to May 12, 1998, repossessed their collateral. On May 29, 1998, Doughty's filed a voluntary chapter 11 petition. The case subsequent-

ly was converted to chapter 7 on June 24, 1998.

The Trustee filed this adversary complaint seeking a determination of the validity, priority and extent of Transamerica and Amana's liens on or interests in the repossessed collateral and in certain collateral items held in storage. In particular, the Trustee seeks a determination of the rights of Transamerica and Amana as inventory financers vis-à-vis the rights of Doughty's customers for whom Sales Orders exist with respect to the repossessed collateral or in whose names inventory items were tagged. This matter is before me on the Trustee's motion for summary judgment. Resolution of the dispute requires analysis of the interplay among various sections of the UCC, with particular emphasis on § 9–307.[1]

Between July 25, 1997, and April 30, 1998, Doughty's sold to customers appliances which subsequently were repossessed by Transamerica and Amana. These sales are evidenced by Sales Orders which include the name of the manufacturer, the SKU number (an industry standard model number), the stock number, and a description of each appliance sold, including its color. Doughty's sold consumer appliances and electronic equipment in high volumes from several stores, and customer Sales Orders would be filled either from inventory on the floor or from inventory ordered from the manufacturers whose product lines were carried by Doughty's. Doughty's inventory was turning over constantly from customer sales and orders to manufacturers to restock.

Transamerica and Amana contend that the Sales Orders do not identify the appliances sufficiently for purposes of § 9–307. Transamerica and Amana further contend that one or more of the following events preclude some if not all of the customers from acquiring rights under the UCC superior to those of a secured inventory financer: (1) the closure of Doughty's inven-

1. Unless otherwise indicated, all section refer-   ences are to the Uniform Commercial Code.

tory financing line with Transamerica on February 13, 1998; (2) the closure of Doughty's inventory financing line with Amana on April 10, 1998; and (3) the entry by the Clackamas County Circuit Court on April 17, 1998, of a temporary restraining order enjoining Doughty's from selling any inventory financed by Transamerica or Amana. Pursuant to a stipulation with Doughty's, during the period May 7 through May 12, 1998, Transamerica and Amana repossessed the inventory each had financed. In addition, Transamerica had a blanket security interest perfected in all of the remaining inventory of Doughty's, which currently is in storage.

The concerned customer Sales Orders fall into three categories based upon the down payments made by the customers: those for which no down payment was made, those for which some down payment was made, and those for which the entire purchase price was paid.[2] None of the concerned collateral items is unique or unusual. Over time, Doughty's had acquired and sold significant quantities of each appliance model concerned in this adversary proceeding.

### LEGAL DISCUSSION

#### A. Summary Judgment Standards.

Granting a motion for summary judgment is appropriate only if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Bankr.P. 7056; Fed.R.Civ.P. 56(c); State Farm Mutual Auto. Ins. Co. v. Davis, 7 F.3d 180, 182 (9th Cir.1993). Material facts are such as may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to draw all inferences from the evidence in the light most favorable to the nonmoving party. Id.

#### B. Disposition of Inventory Collateral.

1. Customers Who Have Made No Down Payment. At the Hearing, the parties both recognized that there was one category of Doughty's customers with respect to which their disputes were easily resolved. Those customers represented by Sales Orders who paid nothing for their purchases would have to pay the entire retail purchase price to Transamerica in order to receive their goods. Such payment would maximize the recovery to Transamerica upon disposition of its collateral. Accordingly, the parties are agreed that a notice will be sent to all such Doughty's customers setting a deadline for them to tender full payment in cash or cash equivalents for their merchandise. If full payment is not received by the deadline, Transamerica will be free to dispose of the merchandise covered by such customers' Sales Orders for its own account in a commercially reasonable manner.

2. Sales Prior to Line Closure. Section 9–306(2) provides that "... a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise ...." [Emphasis added.] The Inventory Security Agreements between Doughty's and Transamerica and Amana respectively, each allowed "sales of inventory at retail in the ordinary course of [Doughty's] business." See Declaration of Kathy Moody, Exhibit A, p. 2, ¶ 5(c), and Exhibit B, p. 1, ¶ 5(c).

█ Both Inventory Security Agreements provide that they are to be interpreted and enforced in accordance with Illinois law. See Declaration of Kathy

---

**2.** Transamerica and Amana do not differentiate between Doughty's customers who paid the purchase price in full or who made only a partial down payment for the items they wished to purchase, and I find no reason to differentiate between the two groups of customers for purposes of this proceeding.

Moody, Exhibit A, p. 3, ¶ 16, and Exhibit B, p. 3, ¶ 16. However, Transamerica and Amana take the position that the choice of law provisions in the Inventory Security Agreements control with respect to issues between Doughty's and the respective secured parties only. Transamerica and Amana argue that disputes between the secured parties and third party customers are governed by the law of the state where the collateral is located and where the security interests of Transamerica and Amana are perfected—in this case, Oregon.

I agree. Official Comment 1 to § 9–103 provides: "[W]hen conflicting claims to collateral arise, the question depends on *perfection* of security interests, and thus on the effect of perfection or non-perfection." Section 9–103(1)(b) provides that ". . . the effects of perfection or non-perfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected."

Because the security interests of Transamerica and Amana were perfected in Oregon, Oregon law applies. Section 9–103(1)(b) recognizes that it would not be fair to require buyers of financed inventory collateral, who were not parties to the Inventory Security Agreements, to be bound by a choice of law provision to which they did not agree. ORS 79.3060(2), consistent with § 9–306(2), recognizes sales free of a security interest if the security agreement authorizes such sales.

■ The record indicates that all of the Doughty's customer Sales Orders in dispute in this proceeding were entered into in the ordinary course of Doughty's business. Transamerica and Amana do not contend otherwise, at least with respect to Sales Orders dated prior to line closure. Accordingly, I find that customer Sales Orders with respect to Transamerica collateral entered into prior to February 13, 1998, when the Transamerica inventory financing line was closed, were authorized by the security agreement between Transamerica and Doughty's. Likewise, I find that customer Sales Orders with respect to Amana collateral entered into prior to April 10, 1998, when the Amana inventory financing line was closed, were authorized by the security agreement between Doughty's and Amana. Customers with all such Sales Orders take their Doughty's merchandise free of the security interests of Transamerica and Amana, consistent with the provisions of ORS 79.3060(2).

3. *Sales Subsequent to Line Closure.* The difficulty inherent in resolving the competing claims of parties such as Transamerica and Amana and the Doughty's retail customers concerned in this adversary proceeding is that the "villain" of this piece has left the stage—permanently. An insolvent Doughty's is in no position to make them whole, and it is up to the court to determine between two innocent parties who should bear the risk of loss.

White and Summers answer the risk of loss issue with the following example:

"Consider the case of Mrs. Jones who buys a washing machine from Big George's Appliance Store. Assume further that Bank has filed a financing statement which covers all of Big George's inventory and that the security interest is not discharged by sale. In these circumstances is it reasonable to expect Mrs. Jones to search the files, to ask Bank for a subordination? And if that is not reasonable, is it fair to permit Bank to assert its security interest in the washing machine after Mrs. Jones has paid full value? Of course, it is neither reasonable to expect her to investigate nor fair to subordinate her interest. Thus, we have 9–307(1) which renders the Bank's security interest subordinate to her interest as purchaser." James J. White and Robert S. Summers, *Uniform Commercial Code* Vol. 4, p. 350 (4th ed.1995).

a. *Section 9–307(1).* Section 9–307(1) provides that:

"A buyer in ordinary course of business ... other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

As with § 9–306(2), Oregon has adopted a version of § 9–307(1) consistent with the model act. *See* ORS 79.3070(1).

Inventory financers, such as Transamerica and Amana, are loath to concede the priority of their secured position in inventory items to any other parties. The disputes in this case focus on whether the concerned customers of Doughty's qualify as buyers in the ordinary course of business.

b. *Buyer in the Ordinary Course.* The definition of a "buyer in the ordinary course of business" is set forth in § 1–201(9):

" 'Buyer in the ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind . . . ."

There is nothing in the record to indicate, and Transamerica and Amana do not argue that the Doughty's customers concerned in this proceeding did not act in good faith. Transamerica and Amana do assert generally that 29 of the concerned transactions occurred after the Clackamas County Circuit Court entered its restraining order against Doughty's disposing of Transamerica and Amana's collateral and violated said order. In these circumstances, Transamerica and Amana argue that such transactions cannot be characterized as having been conducted in the ordinary course of Doughty's business.

However, there is nothing in the record to establish that any of the concerned Doughty's customers knew that a purchase of any product from Doughty's would be in violation of the ownership rights or security interests of Transamerica or Amana, or that any such purchase would be in violation of an order of the Clackamas County Circuit Court. Based upon the sales records set forth in the Affidavit of Kathy Moody, Doughty's customers purchased appliances during normal business hours from a retailer that held itself out to the public as specializing in sales of such items. Accordingly, I find that the Doughty's customers entered into purchase transactions in the ordinary course of Doughty's business in good faith and without knowledge that sales to them would be in violation of the ownership rights or security interests of Transamerica or Amana.

c. *Sale and Identification Issues.* Transamerica and Amana further argue that Doughty's customers are not buyers in the ordinary course of business because no sales to them were consummated, i.e., they never took title to the concerned inventory items, and in any event, the concerned inventory items were not identified to the customers' contracts. I will consider each of these arguments in turn.

i. *Transfer of Title Is Not Dispositive in Article 9.* Transamerica and Amana argue that Doughty's customers cannot qualify as buyers in the ordinary course of business because they did not take title to the goods they wished to purchase, and no sale for UCC purposes took place. Transamerica and Amana rely on the provisions of § 2–106(1), which provides that a "sale" is "the passing of title from the seller to the buyer for a price (Section 2–401)."

The internal reference to § 2–401 in § 2–106(1) is significant. The preamble to § 2–401 states that:

"Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties *applies irrespec-*

*tive of title to the goods except where the provision refers to such title.* Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply...." [Emphasis added.] [3]

By its terms, § 9–307(1) does not limit its application to situations where title has been transferred, and in fact, does not contain any references to title. Not tying the rights of ordinary course buyers to formal title transfers is consistent with the objectives of Article 9. As stated in the Official Comments to § 9–101:

"The aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty.

...

This Article does not determine whether 'title' to collateral is in the secured party or in the debtor and adopts neither a 'title theory' nor a 'lien theory' of security interests. Rights, obligations and remedies under the Article do not depend on the location of title (Section 9–202)." [4]

In other words, Article 9 was designed to facilitate the flow of commerce, and technical issues with respect to title transfers must not be allowed to impede that flow. If a loss arises from the failure of a retail inventory seller, Article 9, and specifically, § 9–307(1), allocates the risk of such loss to the party best able to foresee and protect against or absorb the loss. As stated by the court in *Chrysler Credit Corp. v. Sharp,* 56 Misc.2d 261, 288 N.Y.S.2d 525, 534 (N.Y.Sup.Ct.1968):

"If there is a usage of trade which exposes an entruster on floor plan to certain risks, these are risks against which he can guard by audits and accounting procedures or he can refuse to knowingly expose himself to the risk with the particular dealer.... The Court feels a buyer who makes a purchase on a printed form contract in good faith with a full understanding it is a binding contract, ... must, certainly as to a retail financer furnishing new value on the strength of such contract and as to an entruster giving the dealer wide latitude of sale [sic] goods, be deemed a buyer in the ordinary course of business, without regard to the technicalities of when title is to pass pursuant to collateral oral agreements or as to time of delivery and without the necessity of determining whether such delay brings about technically, a bailment, a non-delivery, a repossession or whatever."

The general provisions of the UCC and its official commentary support an interpretation of § 9–307(1) that would not restrict its application based upon title transfer requirements. Further support is provided by the language used in § 9–307(1) in comparison to a predecessor statute and in the language used in the UCC replevin section in Article 2.

The Uniform Trust Receipts Act § 9(2) (1933) provided protection for a "buyer in the ordinary course of trade," defined as a person "to whom goods are sold and delivered...." The retention of the word "sale" while omitting the requirement of delivery in § 9–307(1) appears to be an intentional deletion of a transfer of title requirement. *See Big Knob Volunteer Fire Co. v. Lowe & Moyer Garage, Inc.,* 338 Pa.Super. 257, 487 A.2d 953, 958 (1985).

---

**3.** The Article referred to in § 2–401 is UCC Article 2 on "Sales," and I note that Official Comment 1 to § 1–206(1) likewise appears to limit its application to Article 2 of the UCC.

**4.** Section 9–202 provides that, "[e]ach provision of this Article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." The Official Comments to § 9–202 state that: "The rights and duties of the parties to a security transaction *and of third parties* are stated in this Article without reference to the location of 'title' to the collateral." [Emphasis added.]

The replevin section of Article 2, § 2–716, requires identification to the contract but not delivery. If an Article 2 buyer is entitled to possession from the seller through replevin or specific performance without a transfer of title through delivery, why should a buyer in the ordinary course under § 9–307(1) be placed in a worse position with respect to a secured lender?

Although there is some contrary authority, the majority of modern decisions reject a transfer of title requirement for the application of § 9–307(1) for the benefit of a buyer in the ordinary course of business. *See, e.g., Carey Aviation, Inc. v. Giles World Marketing, Inc.*, 46 B.R. 458 (D.Mass.1985); *In re Darling's Homes, Inc.*, 46 B.R. 370, 377–79 (Bankr.D.Del. 1985); *Daniel v. Bank of Hayward*, 144 Wis.2d 931, 425 N.W.2d 416, 421–22 (1988); *Big Knob Volunteer Fire Co. v. Lowe & Moyer Garage, Inc.*, 487 A.2d at 958; *Wilson v. M & W Gear*, 110 Ill.App.3d 538, 66 Ill.Dec. 244, 442 N.E.2d 670, 672 (1982); *Holstein v. Greenwich Yacht Sales, Inc.*, 122 R.I. 211, 404 A.2d 842 (1979); and *Rex Financial Corp. v. Mobile America Corp.*, 119 Ariz. 176, 580 P.2d 8 (App.1978).

The decision of the Oregon Supreme Court in *Schultz v. Bank of the West*, 325 Or. 81, 934 P.2d 421 (Or.1997), is not contrary to this line of authority. In *Schultz*, the Oregon Supreme Court ignores the reality of the marketplace and interprets the consignor who grants a security interest as the "seller" for purposes of § 9–307(1) in order to aid the ultimate buyer against the claims of the consignor's se-cured lender. As a matter of policy, the result makes sense for Article 9 purposes. *See* James J. White and Robert S. Summers, *Uniform Commercial Code, supra* at 307. However, as pointed out by Justice Graber in dissent, the majority's interpretation of the consignor as seller in the *Schultz* case ignores the requirement of § 1–201(9) that a buyer in the ordinary course purchase from a seller "in the business of selling goods of that kind." I am quite comfortable that the Oregon Supreme Court, consistent with *Schultz*, would have no troubles of statutory interpretation in determining that the Doughty's customers concerned here are buyers in the ordinary course of business, in spite of their goods not having been delivered for transfer of title purposes.[5]

Each Doughty's Sales Order includes the following statements directly above the customer signature line:

This acknowledges merchandise *purchased* at the price shown and a copy of this invoice. Delivery of merchandise *purchased* by check is subject to check clearing bank. If this is a finance *purchase*, it is subject to the terms and conditions of our Finance Agreement. Returned goods are subject to a 10% restocking fee and must be accompanied by this receipt. Declaration of Kathy Moody, Ex. C [Emphasis added].

Having signed such Sales Orders with respect to particularly described merchandise upon the premises of a volume retail dealer in consumer appliances, Doughty's

---

**5.** Transamerica and Amana rely on the decision of the Florida District Court of Appeal in *Kit Car World, Inc. v. Skolnick*, 616 So.2d 1051 (Fla.App.Ct.1993), in support of their argument that transfer of title is indispensable to buyer in the ordinary course status. In the *Kit Car World* case, the defunct and insolvent seller had been in the business of selling replica car kits. Seven customers who had paid full price for kits that they never received intervened in litigation with the secured inventory financer, claiming a conversion of their kits. The court found that there were enough parts in the seller's inventory to complete seven kits. *But,* no such kits had been put together, and there were no matches between the numbers on frames and bodies of replica cars in inventory with numbers on the customers' purchase orders. The case might have turned on lack of identification to the customers' contracts rather than on no transfer of title. In any event, the court appeared to be particularly troubled that many other customers who had paid full price for nondelivered kits were not represented in the litigation, and similarly situated customer creditors, accordingly, would be treated very differently if the seven intervening customers succeeded with their claims. *See id.* at 1054.

customers had every legitimate expectation that they had bought the goods covered by the Sales Orders. To hold that no "sale" took place in these circumstances, as urged by Transamerica and Amana, because of a technical issue as to title transfer, would be contrary to the provisions and spirit of § 9–307(1) and would run counter to the understanding of the marketplace. Accordingly, I find that title transfer, through delivery or otherwise, is not required to confer buyer in the ordinary course status on the Doughty's customers concerned in this proceeding for purposes of ORS 79.3070(1).

ii. *The Goods in Inventory Were Identified to the Sales Orders.* As a next line of defense, Transamerica and Amana argue that Doughty's customers are not entitled to buyer in the ordinary course status because the goods they purported to buy were not properly identified to the contract. The concept of identification is discussed in § 2–501(1), which provides:

> "[I]dentification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs (a) when the contract is made if it is for the sale of goods already existing and identified...."

The text of § 2–501 and its official commentary indicates that the primary purpose of identification is to establish a "special property" and an insurable interest in goods. Comment No. 2 states:

> "In the ordinary case identification of particular existing goods as goods to which the contract refers is unambiguous and may occur in one of many ways. It is possible, however, for the identification to be tentative or contingent. *In view of the limited effect given to identification by this Article, the general policy is to resolve all doubts in favor of identification.*" [Emphasis added.]

█ Because § 9–307(1) provides for an exception to the general rule that a party with a security interest that is properly attached and perfected prevails against the competing claims of parties whose claims are not so perfected, it is appropriate that a consumer buyer must present a claim to existing and identified goods in order to prevail against a fully perfected inventory financer. Most courts that have considered this issue have so held. *See, e.g., In re Darling's Homes, Inc.*, 46 B.R. at 378–79; *Daniel v. Bank of Hayward*, 425 N.W.2d at 423; *Big Knob Volunteer Fire Co. v. Lowe & Moyer Garage, Inc.*, 487 A.2d at 958; and *Holstein v. Greenwich Yacht Sales, Inc.*, 404 A.2d at 845. I have found no Oregon decisions on point.

In *Wilson v. M & W Gear*, 66 Ill.Dec. 244, 442 N.E.2d at 673, the Illinois Court of Appeals rejected the need for identification entirely in the § 9–307 context. In *Wilson*, a customer purchased a fourteen foot M & W grain drill that was not currently in the seller's inventory. The customer paid for the drill by trading in his old drill and tendering a check for the balance of the purchase price. Within two weeks thereafter, M & W delivered two such grain drills to the seller, and the seller notified the customer that his drill had arrived. Further, on several occasions before the secured party took possession of the seller's remaining inventory, seller's owner discussed with the customer the attachments that would be necessary for the drill, and arrangements for its delivery. The *Wilson* court minimized the importance of identification in arriving at its decision in favor of the customer, following an earlier decision of the Illinois Appellate Court in *Herman v. First Farmers State Bank of Minier*, 73 Ill.App.3d 475, 29 Ill.Dec. 787, 392 N.E.2d 344 (App. Ct.1979), a case involving fungible bulk goods.

In my view, the Illinois Appellate Court went too far in declaring identification unnecessary in the *Wilson* case, where there was substantial evidence to establish identification to the contract for §§ 2–501 and 9–307(1) purposes. Bearing in mind the admonition of Official Comment No. 2 to

§ 2–501 to resolve all doubts in favor of identification, the result in *Wilson* appears reasonable and justified. However, for the reasons stated in Section B.2 of this Memorandum Opinion, I am not bound by *Wilson*.

■ In this proceeding, the record establishes that certain Doughty's inventory items have been tagged for particular customers, and with respect to other items in inventory, either repossessed by Transamerica or Amana or in storage, the Sales Orders identify the purchased goods by manufacturer, model number, SKU number, description and color. I agree with the *Wilson* court in this instance that "[r]equiring a serial number on each order form would be superfluous." *See Wilson v. M & W Gear*, 66 Ill.Dec. 244, 442 N.E.2d at 674.

It is not clear from the record what specific items were in inventory when the Sales Orders were prepared. However, Doughty's was a volume retailer of consumer appliances and electronic equipment from a number of stores. It had acquired and sold significant quantities of each appliance model concerned in this adversary proceeding. Doughty's had lines of credit with its suppliers that allowed it to fill inventory orders on a revolving basis. If a particular appliance or equipment model was not in stock in sufficient quantities to fill all customer orders on a given day, Doughty's would fill the customers' Sales Orders from its next deliveries from the manufacturer.

In these circumstances, I find that the Sales Orders or identifying tags adequately identified appliances to the customers' contracts for purposes of §§ 2–501 and 9–307(1), and I further find that such identification applies with respect to all Dough-

ty's inventory whether repossessed by Transamerica or Amana, or in storage and whether or not all such inventory was in stock at Doughty's at the time that any concerned Sales Order was prepared.[6]

Based upon the foregoing findings, I find that the Doughty's customers with Sales Orders or identifying tags covering goods in storage or among repossessed inventory were buyers in the ordinary course entitled to their goods purchased from Doughty's free of the security interests of Transamerica and Amana pursuant to ORS 79.3070(1).

■ 4. *Section 2–502 Does Not Apply to Disputes Between Buyers and Secured Parties.* Transamerica and Amana contend that § 2–502, covering Buyer's Right to Goods on Seller's Insolvency, applies in this proceeding. Based on that premise, Transamerica and Amana further argue that the Doughty's customers concerned in this proceeding either have not established or cannot establish that the requirements of § 2–502 have been met to allow them to recover the goods described in their Sales Orders.

I disagree, based on the structure of the UCC. Article 2 deals with disputes and relations between buyers and sellers. Article 9 deals with the rights and obligations of secured parties. Sections 9–306 and 9–307 provide for the interface between inventory financers and buyers. I find that § 2–502 is irrelevant to the relationship between inventory financers and buyers and does not govern the resolution of the issues raised in this proceeding. *See, e.g., Carey Aviation, Inc. v. Giles World Marketing, Inc.*, 46 B.R. at 460–61; and *In re Pennsylvania Conveyor Co., Inc.*, 31 B.R. 680, 681–83 (Bankr.W.D.Pa.1982).

---

**6.** The Trustee concedes that if a Sales Order purports to cover goods that were not in Doughty's inventory, either repossessed or in storage, the concerned customer would have no inventory claim.

However, an additional issue is raised with regard to customer Sales Orders for multiple items where only some of the goods reflected on the Sales Orders were in inventory. The parties are submitting additional briefs, at their request, and I have scheduled a further hearing to consider this issue.

**5.** *The Trustee's Avoidance Powers Do Not Cut Off the Rights of Buyers in the Ordinary Course Against Secured Inventory Financers.* Transamerica and Amana further rely on the argument that the rights of buyers in the ordinary course are cut off by the avoidance powers of the bankruptcy trustee pursuant to § 544(a) of the Bankruptcy Code. 11 U.S.C. § 544(a) provides that:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
>
> (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or
>
> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists [and has perfected such transfer].

The trustee's avoidance powers under 11 U.S.C. §§ 544(a)(1) and (2) cut off the rights of judgment and lien creditors with rights unperfected as of the bankruptcy filing date against the bankruptcy estate and, therefore, are not applicable to the dispute before me. 11 U.S.C. § 544(a)(3) works to cut off the rights of bona fide purchasers of real property only. The analogous parties with respect to personal property are buyers in the ordinary course of business. Yet, there is no reference in 11 U.S.C. § 544(a) to such buyers.

Since Congress dealt specifically with bona fide purchasers of real property and included no provisions with respect to buyers in the ordinary course of business of personal property in 11 U.S.C. § 544(a), when it clearly could have done so, I find that 11 U.S.C. § 544(a) does not work to cut off their rights against secured party inventory financers.[7]

### CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, I find that the Trustee is entitled to partial summary judgment for the benefit of Doughty's customers with respect to Sales Orders or tagged inventory covering inventory repossessed by Transamerica or Amana or remaining in storage. To the extent that no inventory was repossessed or is in storage with respect to particular Doughty's customer Sales Orders, I understand that the Trustee is asserting no claim. I will prepare and enter a final judgment on partial summary judgment, since I find there is no just reason for delay, consistent with the provisions of Fed.R.Civ.P. 54(b), applicable in this adversary proceeding pursuant to Fed.R.Bankr.P. 7054.

The issue of potential buyer in the ordinary course status with regard to Sales Orders where repossessed inventory or stored inventory exists for part but not all of the order is to be briefed and heard at the hearing scheduled for September 22, 1999. I further am reserving for trial issues with respect to customer Sales Orders dated following the dates of reposses-

---

**7.** Doughty's customers may have independent claims against Doughty's bankruptcy estate subject to allowance and in the priorities as provided for in Sections 502 and 507(a) of the Bankruptcy Code, 11 U.S.C. §§ 502 and 507(a).

sion, and customer Sales Orders, if any, competing for the same inventory items.